DANIEL BULGER *et al.*, Plaintiffs-Appellees and Cross-Appellants, v. THE CHICAGO TRANSIT AUTHORITY *et al.*, Defendants-Appellants and Cross-Appellees.

First District (6th Division)    No. 1—01—0871

Opinion filed December 12, 2003.

104

Robert S. Rivkin, Thomas J. Bamonte, and Ellen Partridge, all of Chicago Transit Authority, of Chicago (Laura Wunder and Stephen L. Wood, of counsel), for appellants.

Marvin A. Brustin, Ltd., of Chicago (Marvin A. Brustin and Richard E. Foss, of counsel), for appellees.

PRESIDING JUSTICE O'MARA FROSSARD delivered the opinion of the court:

Plaintiff Daniel Bulger sued defendants, the Chicago Transit Authority (CTA) and Tony E. Williams, for personal injuries plaintiff incurred when he was struck by a CTA bus driven by Williams. Bulger's wife, plaintiff Rodica Lung, sued for loss of consortium. After a trial, the jury returned a verdict in plaintiffs' favor. However, the jury found Bulger 50% contributorily negligent and reduced the damages award accordingly.

On appeal, defendants seek a new trial on the issue of liability, contending that the trial court improperly admitted the CTA's post-

accident disciplinary measures, that admission of those measures was highly prejudicial, and that because the CTA's internal rules and procedures lack the force of law, they should not have been incorporated into the jury instructions as evidence of negligence. On cross-appeal, plaintiffs seek a new trial on both liability and damages. They contend that the jury's failure to award Lung any damages for loss of consortium and the jury's minimal damages award for pain and suffering were not justified by the evidence and are inconsistent with the extensive award for medical expenses. Plaintiffs further contend that judgment notwithstanding the verdict should have been granted because no evidence established that Bulger was contributorily negligent or that a new trial should be granted as the result of cumulative error.

We reverse and remand for a new trial on liability and damages.

## BACKGROUND

The accident at issue took place around 11:30 a.m. on March 29, 1995, at the intersection of Dearborn and Polk Streets in Chicago. Polk runs east-west, while Dearborn runs north-south, dead-ending at Polk to the south. Bulger was crossing Dearborn from east to west and Williams was turning left from Polk onto Dearborn when the accident occurred.

At trial, Bulger testified that he walked up to the northeast corner of Dearborn and Polk, waited for a car on Polk to take a right turn onto Dearborn, and then started walking across the street in the crosswalk. He was about halfway across when he was hit by a bus. Bulger stated that he was "knocked off [his] feet and some distance to the north." Eventually, an ambulance took Bulger to the hospital, where he was treated and released. Bulger testified to several injuries that resulted from the accident. On cross-examination by defendants, Bulger insisted that he did not see the bus until it hit him and acknowledged his deposition testimony that he was approximately four steps into the intersection when he was hit.

An eyewitness to the accident, Ken Kotz, testified that Bulger was walking in the crosswalk when he was hit by a bus and knocked backward to the ground. Kotz recalled the bus stopping in the turn lane on Polk and then accelerating as it turned left onto Dearborn. Kotz did not recall seeing Bulger look in the direction of the bus or stop at the curb before entering the intersection.

Williams testified that he came to a complete stop at the stop sign on Polk and put on his left turn signal. When the intersection and crosswalks were clear, he proceeded to make a left turn onto Dearborn, driving three to five miles per hour. About four or five feet

beyond the crosswalk on Dearborn, the front left corner of the bus hit Bulger, whom Williams had not seen before impact. Williams "mashed" the brakes and saw Bulger falling backwards onto the ground. Williams got out of the bus to assist Bulger. Later, Williams told a police officer at the scene, "[Bulger] must have ran [sic] out, I don't know where he came from, just a pedestrian all of a sudden appeared in front of the bus."

Williams further testified that the CTA determined he had violated their internal rules, and as a result, he was given additional training. According to Williams, the additional one-day training, which was attended by a number of employees, "consisted of making left-hand turns, intersection procedures, pedestrians in crosswalks and basically when you put on your turn signals, stuff like that as far as approaching the intersection and being aware of everything within that intersection and not being—coming in contact with anything or anybody."

Willy Lipsey, who was employed as a transportation manager for the CTA in March 1995, testified that he was involved in the investigation of the accident. Lipsey went to the scene of the accident and, a few days later, prepared a "Special Occurrence Report" based solely on his interview with Williams. Lipsey did no independent investigation. In the report, Lipsey indicated that Williams had violated the CTA's internal rule B.4.6.1 and the CTA's standards of procedure (SOPs) 150, 416, 417, and 8132. Lipsey testified that Williams was sent to retraining and acknowledged that not every driver involved in an accident is retrained. He explained why he charged Williams with rule violations and sent him to retraining.

On cross-examination by defendants, Lipsey stated that the point of retraining is to "correct any bad habits that bus operators might have developed." He further indicated that he did not have any independent knowledge that Williams had any bad habits that needed correcting, but decided to send Williams to retraining "due to the accident." He testified that the fact Williams was sent to retraining did not have anything to do with who actually caused the accident, stated that operators involved in accidents are sent to retraining a "majority of the times," and agreed that retraining is "an automatic function of the CTA." He also stated that he had reached no conclusions about whether Williams saw the pedestrian. On redirect, Lipsey clarified that drivers are not sent to retraining "all the time," and agreed that whether drivers are sent "has to do with [his] determination as to whether or not this driver was going to need retraining." On re-cross-examination, he agreed that his decision to send Williams for retraining was "pretty automatic."

Dr. Aref Senno testified that he examined Bulger on March 30, 1995, the day after the accident. At that time, Bulger complained of headache and pain in his neck, right foot, and left eye. Dr. Senno diagnosed Bulger with spasm of the neck muscles. He prescribed Bulger an analgesic and a muscle relaxant, ordered a neck X ray, and referred Bulger to a chiropractor. About three weeks later, Dr. Senno, with the agreement of the chiropractor, ordered an MRI (magnetic resonance imaging) of Bulger's right shoulder. For a time, Bulger "became better and better," yet his neck pain would come and go. When Bulger's reports of shoulder pain did not subside by 1997, Dr. Senno and the chiropractor enlisted the services of an orthopedic surgeon, Dr. Leonard Smith, who ordered an MRI for Bulger's right shoulder and eventually operated on that shoulder in 1998. In 1999, when Bulger returned to Dr. Smith with complaints of pain in his neck, Dr. Smith ordered an MRI of that area. The MRI revealed a herniated disk in Bulger's neck, for which Dr. Smith advised further physical therapy. Dr. Senno stated his opinion, to a reasonable degree of medical and surgical certainty, that the accident caused injury to Bulger and that the injuries were permanent.

On cross-examination, Dr. Senno reviewed a number of complaints or reports of pain made by Bulger after his original release from care on August 5, 1995. Specifically, Dr. Senno confirmed that Bulger returned on September 16, 1995, complaining of pain in his right shoulder that developed from an activity. Bulger returned on December 2, 1995, complaining of a flare-up of right shoulder pain and stiffness. On January 18, 1996, Bulger reported to the chiropractor that he experienced sharp shoulder pain at the base of his neck when he lifted a bag; on January 29, 1996, Bulger reported "an incident" that aggravated his right shoulder; and on June 14, 1996, he reported acute flare-up of shoulder pain due to reaching. On December 30, 1996, he reported exacerbation of back and right shoulder pain. On February 20, 1997, Dr. Senno referred Bulger to Dr. Smith for an orthopedic consult regarding the shoulder, and Dr. Smith took an MRI on April 26, 1997. On June 18, 1997, Dr. Smith made a notation in his records that "[p]atient exacerbation of right shoulder developed during activity." Bulger complained of feeling pain in his neck and right shoulder while involved in activity on November 15, 1997; complained of acute flare-up with stiffness in his shoulder and neck on May 15, 1998; and reported exacerbation of right shoulder pain on June 19, 1998. After reviewing these complaints and reports of pain, Dr. Senno agreed that after Bulger was initially released from treatment, he injured or exacerbated injuries to his shoulder or neck several times while engaging in activities such as reaching or carrying a bag.

On re-cross-examination, Dr. Senno agreed that it was probable that Bulger suffered from tendinitis in his right shoulder before the accident, as repetitive motion can create tendinitis. However, he insisted that "the affect and the action point to the accident" as a cause. Dr. Senno also acknowledged that in the time between the 1995 and the 1997 MRIs of Bulger's right shoulder, "there were several incidents during activities in which [Bulger] hurt his shoulder and his neck."

Dr. Leonard Smith, the orthopedic surgeon to whom Dr. Senno had referred Bulger, testified that he first examined Bulger on March 11, 1997. At that time, Bulger complained of shoulder pain and weakness, and Dr. Smith's physical findings were a restriction of motion and pain in internal rotation and abduction of the shoulder. An MRI of Bulger's shoulder from 1995 suggested tendinitis and a possible tear of the rotator cuff. Because the MRI was old, Dr. Smith ordered a new MRI of the right shoulder in April 1997. This MRI was suggestive of persisting tendinitis localized to the area of attachment of the supraspinatus tendon, which is part of the rotator cuff, and an incomplete tear. Based upon Bulger's clinical condition and the MRI, Dr. Smith felt there was a high degree of probability that Bulger's rotator cuff was torn. Accordingly, Dr. Smith operated on the shoulder. During the surgery, Dr. Smith confirmed tendinitis and partial rupture of the tendon and repaired the tear. The surgery also revealed a congenital defect in Bulger's shoulder that caused a portion of his shoulder to be narrower than normal. While asymptomatic, the condition would have rendered Bulger more susceptible to injury.

Dr. Smith stated his opinion, based upon the history given to him by Bulger and the lack of evidence of any other preexisting symptomatic conditions, that the torn rotator cuff was more likely than not the result of the accident. Dr. Smith also opined that Bulger's torn rotator cuff and tendinitis would be productive of pain, and that his condition could be partially disabling due to pain, associated weakness, and some limitation of function. He stated that the operation he performed does not produce 100% recovery, strength, or range of motion, and that due to scarring, which tends to lead to some inflammation, some residual permanent impairment always exists as a result of a torn rotator cuff. With regard to Bulger's surgery, Dr. Smith stated, "I would say it was successful, but there is still some permanent impairment." As of trial, Bulger still experienced some limitation of motion and some weakness. Dr. Smith also indicated that Bulger's future impairment might include stiffness, soreness, and a minor degree of pain.

Dr. Smith further testified that he later became involved in the

care and treatment of Bulger's neck. An MRI of Bulger's neck, taken on August 9, 1999, was suggestive of a herniated disk. According to Dr. Smith, the type of herniated disk Bulger suffered from causes headaches and pain in the neck. Dr. Smith testified that a second MRI of Bulger's neck, taken in April 2000, showed no significant change. Based on the absence of any prior symptoms or neck problems, Dr. Smith opined that the herniated disk in Bulger's neck was related to the accident. He also stated his opinion that elements of Bulger's neck problem were going to be permanent and indicated that if the symptoms did not subside with medication and therapy, future surgical correction was a possibility.

Dr. Smith stated that he diagnosed Bulger with postconcussion syndrome even though the results of both an EEG (electroencephalogram) and a CAT (computerized axial tomography) scan were negative. In the absence of objective indications of the syndrome, Dr. Smith based his diagnosis on Bulger's symptoms and subjective complaints, such as headaches. Based on the lack of prior complaints of headaches, Dr. Smith opined that Bulger's postconcussion syndrome was caused by the accident. He further opined that "some part of" the syndrome would be permanent.

Following deliberations, the jury returned a verdict for plaintiffs, awarding $66,000 for past medical expenses, $50,000 for future medical expenses, $110,000 for past and future disability, $3,000 for past pain and suffering, and $24,000 for future pain and suffering. However, the jury found Bulger 50% contributorily negligent and reduced the damages award accordingly. The jury gave no award to Lung for loss of consortium.

## ADMISSION OF EVIDENCE OF POSTACCIDENT REMEDIAL MEASURES

We begin our analysis with defendants' contention that the trial court improperly allowed evidence that Williams was "charged" with violating internal CTA rules and procedures regarding optimal defensive driving techniques and that the CTA sent Williams for safe driving retraining. Defendants argue that the law requires the exclusion of postaccident remedial measures offered to prove negligence. Plaintiffs respond that the trial court properly allowed the admission of the CTA's subsequent remedial measures under the holding of *Pearl v. Chicago Transit Authority*, 177 Ill. App. 3d 499 (1988).

■ A trial court's decision regarding whether to admit evidence is reviewed for abuse of discretion. *Gill v. Foster*, 157 Ill. 2d 304, 312-13 (1993). Where a trial court abuses its discretion in admitting evidence, a new trial should be ordered only when the improperly admitted

evidence affected the outcome of the trial. *Schmidt v. Ameritech Illinois*, 329 Ill. App. 3d 1020, 1040-41 (2002), citing *Tzystuck v. Chicago Transit Authority*, 124 Ill. 2d 226, 243 (1988).

■ In general, evidence of postaccident remedial measures is not admissible to prove prior negligence. *Herzog v. Lexington Township*, 167 Ill. 2d 288, 300 (1995). The plaintiff in *Herzog* claimed that the absence of signs on the roadway led to his single-car accident. The trial court excluded, as postaccident remedial measures, evidence of the defendant placing additional signs on the roadway following the accident. The appellate court reversed the trial court and allowed the evidence of postaccident remedial measures as impeachment. The Illinois Supreme Court found that because the defendant did not exaggerate the safety of the roadway, the plaintiff was not entitled to impeach this testimony with evidence of postaccident remedial measures. *Herzog*, 167 Ill. 2d at 303. Our supreme court in *Herzog* provided several reasons for the postaccident remedial measures exclusionary rule: (1) a strong public policy favors encouraging improvements to enhance public safety; (2) subsequent remedial measures are not considered sufficiently probative of prior negligence, because later carefulness may simply be an attempt to exercise the highest standard of care; and (3) a jury may view such conduct as an admission of negligence. *Herzog*, 167 Ill. 2d at 300.

There are several exceptions to the general rule excluding evidence of postaccident remedial measures. Evidence of a defendant's postaccident remedial measures may be admitted where the defendant did not act voluntarily, but was required to act by an outside governmental authority. See *LoCoco v. XL Disposal Corp.*, 307 Ill. App. 3d 684, 693 (1999); *Gaunt & Haynes, Inc. v. Moritz Corp.*, 138 Ill. App. 3d 356, 365 (1985); *Millette v. Badosta*, 84 Ill. App. 3d 5, 19 (1980). Additionally, we are mindful that evidence of a defendant's postaccident remedial measures may be admissible for purposes such as proving ownership or control of property where disputed by the defendant, proving feasibility of precautionary measures where disputed by the defendant, or impeachment without inference of prior negligence. *Herzog*, 167 Ill. 2d at 300-03. Regarding the use of postaccident remedial measures as impeachment, *Herzog* cautioned as follows:

"Just as evidence of subsequent remedial measures is not considered sufficiently probative to be admissible to prove prior negligence, that evidence is not admissible for impeachment where the sole value of the impeachment rests on that same impermissible inference of prior negligence.

Allowing such evidence in these circumstances would swallow the general rule prohibiting the introduction of subsequent

remedial measures and frustrate the policy considerations that support it. In every case, a defendant will dispute that his prior conduct was negligent. Once a defendant disputes his or her negligence at trial, a plaintiff could always seek to introduce evidence of subsequent remedial measures under the guise of impeachment. Thus, the general rule of excluding evidence of subsequent remedial measures would be swallowed by the impeachment exception. Furthermore, contrary to the policies supporting the general rule, parties to lawsuits would be discouraged from making improvements for fear that such actions would be used against them at trial.

Where the impeachment value rests on inferences other than prior negligence, such evidence may be admitted where its probative value outweighs the prejudice to defendant." *Herzog*, 167 Ill. 2d at 301-02.

Based on the record, we find that none of the "exceptions" to the general rule apply in the instant case. Here, the value of the evidence that Williams was charged with violating CTA rules and sent to retraining rested upon the impermissible and highly prejudicial purpose of proving defendants' negligence. The CTA's internal rules were incorporated into the jury instructions regarding evidence of negligence. Plaintiffs' counsel, in arguing against defendants' motion to bar this evidence, stated that evidence of CTA rule violations and retraining "will all help the jury understand what the responsibilities are as to whether or not there is negligence." Moreover, the evidence of CTA rule violations and retraining was not offered to show ownership of property, prove feasibility of precautionary measures, or impeach any witness. The record does not reflect that the CTA was required to investigate, charge, and discipline Williams by any outside governmental authority. Instead, the CTA did so under its own voluntary internal policy. In essence, the CTA voluntarily decided to investigate the accident, charge Williams with various violations, and send him to retraining. Thus, the CTA's actions fell within the scope of inadmissible postaccident remedial actions, and evidence of those actions should have been barred. The admission of the evidence was not harmless. As noted above, the value of the evidence rested upon the highly prejudicial purpose of proving prior negligence. See *Herzog*, 167 Ill. 2d at 300.

Plaintiffs argue that our decision on this issue should be controlled by *Pearl v. Chicago Transit Authority*, 177 Ill. App. 3d 499 (1988). In *Pearl*, a pedestrian was struck and injured by a CTA bus. A garage superintendent from the CTA testified in *Pearl* that he reviewed the accident and prepared a disciplinary report and suspension notice. *Pearl*, 177 Ill. App. 3d at 500. The notice of suspension indicated that

the bus driver had violated rules contained in the CTA bus system rule book pertaining to observation of intersection traffic signals, proceeding through intersections, and general adherence to defensive driving practices. *Pearl*, 177 Ill. App. 3d at 500-01. The CTA garage superintendent testified that before being returned to service, the bus driver participated in a retraining program. *Pearl*, 177 Ill. App. 3d at 501. A controller from the CTA testified as to the bus driver's violation of the CTA's internal defensive driving rules and the driver's suspension. *Pearl*, 177 Ill. App. 3d at 501. Additionally, a bus service instructor testified regarding the driver's retraining. *Pearl*, 177 Ill. App. 3d at 501-02.

In reviewing whether this testimony should have been admitted, the *Pearl* court noted that testimony pertaining to postaccident remedial measures generally is excluded in negligence cases, and explained that the rationale for this general rule is that parties should not be discouraged from undertaking safety measures. *Pearl*, 177 Ill. App. 3d at 503. The court then explained why the general rule did not apply in the *Pearl* case:

> "That rationale, however, finds no apparent application here because the testimony adduced at trial related to procedures automatically undertaken as a matter of CTA policy whenever an operator was involved in an accident with a pedestrian. We have difficulty understanding why the general rule prohibiting testimony of subsequent remedial measures should obtain in this case as the reason for the rule, the likelihood of discouraging the undertaking of safety measures, would seem obviated by mandated CTA policy."

*Pearl*, 177 Ill. App. 3d at 503.

*Pearl* recognized the general rule prohibiting testimony of post-accident remedial measures and further noted that the rationale for the rule was that parties should not be discouraged from undertaking safety measures. *Pearl*, 177 Ill. App. 3d at 503. After the *Pearl* court explained why this rule did not apply, the court concluded that it need not decide the appeal on the basis of the general rule prohibiting testimony of postaccident remedial measures because the testimony at issue in *Pearl* could not properly be characterized as evidence of post-accident remedial measures. *Pearl* indicated as follows:

> "However, we need not decide this appeal on [this] basis because, after reviewing the testimony of Hinman, Morton, and Williams, we cannot conclude that that evidence, consisting generally of the evaluation of Billups' driving ability, may properly be characterized as post-occurrence remedial measures. Rather, that testimony established the evaluations made by CTA supervisory personnel of Billups' knowledge and ability to operate his bus safely at the time of the accident and, as such, constituted admissions which the trial

judge properly permitted as evidence." *Pearl*, 177 Ill. App. 3d at 503-04.

*Pearl* found that the postaccident remedial measures exclusionary rule did not apply, and then proceeded to characterize the testimony at issue as admissions rather than evidence of postaccident remedial measures. In the instant case, relying on *Pearl*, the trial court allowed evidence of postaccident remedial measures as admissions. Allowing such an admissions "exception" would swallow the general rule prohibiting the introduction of postaccident remedial measures and frustrate the policy considerations that support it. Furthermore, contrary to the policies supporting the general rule, parties to lawsuits would be discouraged from making improvements or taking increased safety measures for fear that such actions would be used against them at trial. See *Herzog*, 167 Ill. 2d at 301-02.

The Illinois Supreme Court in *Herzog* recognized the risk that the trier of fact may view evidence of postaccident remedial measures as an admission of negligence and noted that concern as one of the reasons for excluding such evidence. *Herzog*, 167 Ill. 2d at 300. Thus, *Pearl's* admission exception is in conflict with *Herzog*. In addition, *Pearl's* admission exception is in conflict with the rationale behind the "long-standing rule" that evidence of subsequent remedial measures is not admissible as proof of negligence. See *Schaffner v. Chicago & North Western Transportation Co.*, 129 Ill. 2d 1, 14 (1989), citing *Grubb v. Illinois Terminal Co.*, 366 Ill. 330, 351 (1937), *Hodges v. Percival*, 132 Ill. 53, 56-57 (1890), *Lundy v. Whiting Corp.*, 93 Ill. App. 3d 244, 251-52 (1981), and M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 407.1 (4th ed. 1984). Our supreme court has explained the reason for the rule as follows:

> " 'The rationale for this long-standing rule is twofold: *correction of unsafe conditions should not be deterred by the possibility that such an act will constitute an admission of negligence*, and, more fundamentally, a post-occurrence change is insufficiently probative of prior negligence, because later carefulness does not necessarily imply prior neglect.' " (Emphasis added.) *Schaffner*, 129 Ill. 2d at 14, quoting *Lundy*, 93 Ill. App. 3d at 252.

Moreover, we do not find Pearl's discussion regarding application of the postaccident remedial measures exclusionary rule instructive. As previously noted, regarding application of the postaccident remedial measures exclusionary rule, *Pearl* stated: "However, we need not decide this appeal on [this] basis because, after reviewing the testimony[,] *** we cannot conclude that that evidence, consisting generally of the evaluation of [the driver's] driving ability, may properly be characterized at post-occurrence remedial measures."

*Pearl*, 177 Ill. App. 3d at 503. Thus, Pearl's discussion regarding the application of the postaccident remedial measures exclusionary rule was *dicta*.

■ We note that there are essentially two types of *dicta*. *Obiter dicta* are remarks or opinions "uttered by the way" and are "not binding as authority or precedent within the *stare decisis* rule." *Cates v. Cates*, 156 Ill. 2d 76, 80 (1993). Judicial *dicta* are remarks or opinions deliberately passed upon by a court, though not essential to the disposition of the case. *Cates*, 156 Ill. 2d at 80. The *Pearl* court's conclusion that the general rule prohibiting evidence of postaccident remedial measures did not apply is judicial *dicta*, since the court deliberately ruled upon the issue even though the matter was not essential to the court's disposition. See *Cates*, 156 Ill. 2d at 80. We are not required to follow the decisions of an equal or inferior court. *Schiffner v. Motorola, Inc.*, 297 Ill. App. 3d 1099, 1102 (1998) (doctrine of *stare decisis* requires courts to follow decisions of higher courts, but not decisions of equal or inferior courts).

More importantly, we find the rationale for *Pearl's dicta* lacking in the instant case. As previously noted, *Pearl's dicta* regarding the inapplicability of the general rule prohibiting testimony of postaccident remedial measures was based on a finding that the public policy of not discouraging the undertaking of safety measures did not apply because the CTA's actions were "automatically undertaken as a matter of CTA policy." *Pearl*, 177 Ill. App. 3d at 503. In *Pearl* the CTA instructor testified that every operator who was involved in an accident with a pedestrian at an intersection was retrained. In the instant case, in contrast, the CTA transportation manager, Lipsey, testified that not every driver who was involved in an accident was retrained. Retraining was based on the determination by the CTA as to whether or not the driver would need retraining. Unlike *Pearl*, the record in the instant case did not reflect that the CTA's actions regarding safety measures, including retraining, were "automatically undertaken as a matter of CTA policy." The fact that the CTA made a determination as to whether or not a driver required retraining was reflected by plaintiffs' redirect examination of Lipsey as follows:

"Q. [Plaintiff's counsel:] Sir, you said that a majority of the time drivers are sent for retraining. But not all the time, is that correct?
A. No. Not all the time.
Q. And it has to do with your determination as to whether or not this driver was going to need retraining, is that correct?
A. Yes."

*Pearl's* rationale for not applying the general rule excluding testimony of postaccident remedial measures is not supported by the

record in the instant case. *Pearl* found that "the reason for the rule, the likelihood of discouraging the undertaking of safety measures, would seem obviated by mandated CTA policy." *Pearl*, 177 Ill. App. 3d at 503. The record in the instant case reflects no such mandated policy but, rather, internal safety guidelines subject to discretionary application by the CTA. In *Pearl* the CTA bus service instructor testified that "every operator who was involved in an accident with a pedestrian at an intersection was retrained." *Pearl*, 177 Ill. App. 3d at 502. However, in the instant case the record reflects that the CTA uses discretion in determining whether or not remedial action or retraining is necessary.

Moreover, the purpose of the CTA's postaccident remedial measures is to improve the defensive driving skills of its operators thereby maximizing future safety. Lipsey described his investigation as brief. He spoke with Williams, but did not interview Bulger or any other witnesses. Lipsey acknowledged that the statement that Williams made did not demonstrate that Williams violated CTA rules and procedures. Lipsey testified that he had no independent knowledge of rule violations by Williams. Lipsey further stated that he did not know if Williams had in fact developed any bad habits and that was not the purpose of his investigation. Rather, he explained that the purpose of retraining is to "correct any bad habits" that bus operators "might have developed." Lipsey testified that in "charging" Williams and sending him for retraining, the purpose was not to assess fault or determine who caused the accident. Given these circumstances, for the reasons previously discussed, we find *Pearl* factually distinguishable and not instructive.

These factual differences are significant since *Pearl* brushed aside any concern that allowing evidence of postaccident remedial measures could discourage the undertaking of safety measures because such measures were undertaken automatically as a matter of CTA policy. In the factual context of the instant case we do not dismiss such concern. Internal safety guidelines can be amended or repealed. Thus, the public policy of not discouraging the undertaking of safety measures is promoted by prohibiting evidence of postaccident remedial measures as proof of negligence.

We additionally find the public policy discussion in *Pearl* incomplete. We note that *Pearl*'s *dicta* recognized one public policy reason for the postaccident remedial measure exclusionary rule; namely, that parties should not be discouraged from undertaking safety measures. However, *Pearl* failed to consider the other equally important reasons for excluding evidence of postaccident remedial measures, including the fact that such measures are not considered sufficiently reliable to be probative of negligence because later

carefulness may simply be an attempt to exercise the highest standard of care, and the concern that the trier of fact may view postaccident remedial measures as an admission of negligence. *Herzog*, 167 Ill. 2d at 300.

■ We are mindful that factual "time of the accident" evidence and evidence of postaccident remedial measures are distinct types of evidence. As noted by the CTA and Williams in their brief:

> "The CTA agrees that *factual* evidence about an accident obtained through a bus supervisor's accident investigation can be properly introduced as trial evidence. *** For example, the general information about the accident set forth in the 'Summary of Facts' section of Lipsey's report typifies the type of information that is admissible. Likewise, for example, information obtained by CTA personnel during post-accident investigations about the speed or resting point of vehicles, the point of impact and the like is admissible and not generally shielded by the exclusion of evidence of post-accident remedial measures."

In the context of the instant case, the CTA's investigative opinions, conclusions, and follow-up actions are inadmissible as postaccident remedial measures. However, this opinion should not be interpreted as precluding the admission of factual "time of the accident" evidence. We limit our holding, in the context of the instant case, to preclude admission of evidence of postaccident remedial measures to prove negligence. See *Herzog*, 167 Ill. 2d at 300.

## JURY INSTRUCTIONS

Defendants contend that the CTA's internal rules lack the force of law and that, therefore, violation of the rules should not have been incorporated into the jury instructions as evidence of negligence. The instructions in question are plaintiffs' instructions 24A, 25, and 25A, all of which were modeled after Illinois Pattern Jury Instructions, Civil, No. 60.01 (2000) (hereinafter IPI Civil (2000) No. 60.01). A generic IPI Civil (2000) No. 60.01 instruction informs the jury that a statute, ordinance, or administrative regulation was "in force at the time of the occurrence" and the jury may consider its violation as evidence of negligence. IPI Civil (2000) No. 60.01 provides as follows, including the bracketed material:

> "There was in force in the [State of Illinois] [City of _____]
> <sub>e.g., Peoria</sub>
> at the time of the occurrence in question a certain [statute] [ordinance] [administrative (regulation) (rule) (order)] which provided that:
> [*Quote or paraphrase applicable part of statute, ordinance or regulation as construed by the courts.*]

> If you decide that [a party] [the parties] [_____]
> description of non-party
> violated the [statute] [ordinance] [regulation] [rule] [order] on
> the occasion in question, then you may consider that fact together
> with all the other facts and circumstances in evidence in determin-
> ing whether and to what extent, if any, [a party] [the parties]
> [_____] [was] [were] negligent before and at the
> description of non-party
> time of the occurrence."

The notes on the use of IPI Civil (2000) No. 60.01 indicate that the instruction should be given only where the evidence would support a finding that the injury complained of was proximately caused by the violation of a statute, ordinance, or administrative regulation, rule, or order that was intended to protect against such an injury, and where the injured party is within the class intended to be protected by the statute, ordinance, or regulation. IPI Civil (2000) No. 60.01, Notes on Use, at 244.

Each of the instructions in question in this case began with the phrase, "There was in force in the Chicago Transit Authority at the time of the occurrence in question a certain administrative rule which provided that ***." The instructions then presented text from the CTA's internal rules. Instruction 24A incorporated an excerpt from SOP 150, the CTA's "Defensive driving guide." SOP 150 is a multi-page defensive driving guide. The excerpt from SOP 150 pertained to pedestrian ac- cidents and listed the possible actions of pedestrians located in front, behind, or alongside the bus, and the defensive actions that bus opera- tors should take in those situations. Instruction 25 incorporated CTA SOP 416, titled "Making a left turn." The SOP included guidance on how to approach an intersection, prepare to turn left, turn, and straighten out the bus. Finally, instruction 25A incorporated CTA SOP 417, titled "Intersection operation," which instructed bus drivers on how to approach, enter, move through, and leave an intersection. Each of the jury instructions concluded, "If you decide that the parties violated the rule on the occasion in question, then you may consider that fact together with all the other facts and circumstances in evidence in determining whether and to what extent, if any, the parties were negligent before and at the time of the occurrence."

▮ In *Davis v. Marathon Oil Co.*, 64 Ill. 2d 380 (1976), our supreme court set forth the requirements for submission to the jury of administrative rules, regulations, or orders under IPI Civil (2000) No. 60.01. The supreme court stated that rules or regulations must be "designed to protect human life or property," must be "validly adopted," and must "have the force of law." *Davis*, 64 Ill. 2d at 390;

see also Illinois Pattern Jury Instructions, Civil, No. 60.00, Introduction, at 243 (2000) (citing *Davis*, 64 Ill. 2d 380). At issue in this case is whether the CTA's defensive driving guide and SOPs have the force of law.

Defendants contend that the CTA's internal rules lack the force of law. They argue that the CTA's internal rules are not "administrative regulations, rules or orders" within the meaning of IPI Civil (2000) No. 60.01. Instead, they assert that the internal rules "reflect nothing besides [the CTA's] own voluntary internal commitment to fostering maximal safety." Defendants argue that the rules have not been "adopted" by the State of Illinois, the City of Chicago, any federal or state regulatory agency that oversees CTA operations, or the Chicago Transit Board. Defendants point out that no criminal or civil penalties flow from the violation of the rules and that the rules may be amended or repealed by CTA management at any time for any reason.

In the instant case, Lipsey's investigation was brief, consisting of a discussion with Williams and a review of his report. As previously noted, Lipsey was not concerned with discovering who caused the accident or assessing fault but, rather, with maximizing future safety. The record reflects the purpose of the CTA's postaccident investigation, findings, and disciplinary action is to maximize safety, not to determine whether operators are negligent. That conduct constituted "later carefulness" for future safety in "an attempt to exercise the highest standard of care." *Herzog*, 167 Ill. 2d at 300. The CTA implemented a safety program incorporating defensive driving guidelines not necessarily required by law.

Plaintiffs, in contrast, argue that the CTA's internal rules have the force of law because the Illinois legislature granted the CTA the power to determine its own safety regulations through the Metropolitan Transit Authority Act (70 ILCS 3605/1 *et seq.* (West 1998)), which they assert was voted on and adopted by the City of Chicago. Defendants respond that the internal rules were never adopted as ordinances with general application to the community, so they do not have the force of law.

We agree with defendants that the internal CTA rules at issue in this case lack the force of law and therefore should not have been incorporated into the jury instructions or considered by the jury in determining negligence. While our research has revealed no cases defining what is meant by the term "force of law" in the context of IPI Civil (2000) No. 60.01, our supreme court has indicated in other contexts that in order to have the force of law, standards or rules must be imposed by statute or promulgated by a regulatory body and must not be merely aspirational or suggestions. See, *e.g.*, *Bright v. Dicke*, 166 Ill. 2d 204, 210 (1995) ("The rules of court we have promulgated

are not aspirational. They are not suggestions. They have the force of law, and the presumption must be that they will be obeyed and enforced as written").

In their argument that the instructions were proper, plaintiffs cite sections 6 and 31 of the Metropolitan Transit Authority Act as the source of the CTA's power to determine its own safety regulations. Section 6 provides that the CTA

"shall have power to acquire, construct, own, operate and maintain for public service a transportation system in the metropolitan area of Cook County and outside thereof to the extent herein provided and all the powers necessary or convenient to accomplish the purposes of this Act, including, without limiting the generality of the foregoing, the specific powers enumerated herein." 70 ILCS 3605/6 (West 1998).

Section 31 provides that the Chicago Transit Board

"shall have power to pass all ordinances and make all rules and regulations proper or necessary to regulate the use, operation and maintenance of its property and facilities, and to carry into effect the powers granted to the Authority, with such fines or penalties as may be deemed proper. No fine or penalty shall exceed $300.00, and no imprisonment shall exceed six (6) months for one offense. All fines and penalties shall be imposed by ordinances, which shall be published in a newspaper of general circulation published in the metropolitan area. No such ordinance shall take effect until ten days after its publication." 70 ILCS 3605/31 (West 1998).

We acknowledge that section 6 does grant the CTA "all the powers necessary or convenient" to operate its transportation system. However, that does not mean that section 6 confers the force of law to all of the CTA's internal rules and standards. Moreover, the record does not reflect that internal rules and standards have been adopted by any city, state, or federal regulatory agency that oversees CTA operations. Internal rules do not necessarily create legally enforceable duties. "Where the law does not impose a duty, one will not generally be created by a defendant's rules or internal guidelines. Rather, it is the law which, in the end, must say what is legally required." *Rhodes v. Illinois Central Gulf R.R.*, 172 Ill. 2d 213, 238 (1996).

We find instructive *American State Bank v. County of Woodford*, 55 Ill. App. 3d 123, 130 (1978), where the jury was given an IPI Civil (2000) No. 60.01-type instruction that incorporated a standard for the design of county roads extracted from a manual issued by the State of Illinois Department of Transportation (IDOT). On review, the court noted that administrative regulations must have the force of law before they may be incorporated into jury instructions. *American State Bank*, 55 Ill. App. 3d at 131. The court found that because the Illinois

Highway Code did not give IDOT the power to require county roads to conform to any particular standard, the standard in question did not have the force of law. *American State Bank*, 55 Ill. App. 3d at 131-32.

In this case, the CTA's internal rules are guidelines for safety. In contrast, the driving standards with which drivers, including bus drivers, *must* comply are mandated by the various provisions of the Illinois Vehicle Code (625 ILCS 5/11—100 *et seq.* (West 1998)). We note that at least one provision of the Illinois Vehicle Code, section 11—1003.1 (625 ILCS 5/11—1003.1 (West 1998)), which requires that drivers exercise due care to avoid colliding with pedestrians, was properly incorporated into an IPI Civil (2000) No. 60.01-based instruction given to the jury in the instant case. The provisions of the Illinois Vehicle Code have the force of law and are properly incorporated into jury instructions when supported by the evidence.

We also find instructive *Poelker v. Warrensburg-Latham Community Unit School District No. 11*, 251 Ill. App. 3d 270 (1993), where a student sued his school district after he was injured by a discus during a warm-up before a track meet. The trial court rejected a proposed IPI Civil (2000) No. 60.01-type instruction that incorporated certain rules and recommendations of the National Federation of High School Associations, which were adopted by the Illinois Elementary School Association. *Poelker*, 251 Ill. App. 3d at 283. On review, the court found that the instruction was properly rejected because the provisions were not mandatory rules that the school districts were bound to follow. *Poelker*, 251 Ill. App. 3d at 284. Instead, the regulations simply provided guidance on how to regulate track and field events, couching their guidance in terms such as "should" and "recommend" and "would be well advised." *Poelker*, 251 Ill. App. 3d at 284. The court concluded, "Equating these regulations with the force of law would have been inappropriate." *Poelker*, 251 Ill. App. 3d at 285.

We have examined the CTA's defensive driving guide and SOPs regarding making left turns and operating a bus at and through an intersection. While the defensive driving guide and SOPs do not use terms such as "should" and "recommend" and "would be well advised," they nevertheless read as guidebooks, providing direction on how to optimize safety on the road. As in *Poelker*, we conclude that to equate these internal CTA rules with the force of law would be inappropriate.

■ Whether to give or deny a jury instruction is within the trial court's discretion. *Frank v. Edward Hines Lumber Co.*, 327 Ill. App. 3d 113, 119 (2001). A new trial should not be granted because of improper jury instructions unless a party's right to a fair trial has been seriously prejudiced. *Frank*, 327 Ill. App. 3d at 119. The test for

determining the propriety of instructions is whether, considering the instructions in their entirety, the jury was fairly, fully, and comprehensively informed as to the relevant principles. *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 100 (1995).

In this case, jury instructions 24A, 25, and 25A did not form a clear and correct picture of the applicable law and relevant principles. Therefore, we find that the trial court abused its discretion in giving these instructions. We cannot say that the error was harmless. The instructions incorporating the CTA's internal rules were presented together with instructions that incorporated actual statutes. In closing argument, immediately after asking the jury to consider the statutes listed in the instructions as the applicable law, plaintiffs' counsel urged the jury also to consider that Williams had violated three internal rules of the CTA. After describing the Illinois Vehicle Code sections, which were properly used in IPI Civil (2000) No. 60.01 instructions, plaintiff's counsel added:

> "In addition, there are three internal rules of the CTA which have been violated, according to a supervisor at the CTA who said that they were violated."

He further argued:

> "[Williams] did violate those rules according to the CTA, not me. And that is something that you also should consider according to the judge's instructions."

These circumstances communicated to the jury that the internal rules of the CTA had the same force of law as the statutes, which, as explained above, they did not. Incorporating the CTA rules into the instructions allowed the jury to rely on the CTA's internal rules as providing legal requirements of negligence. Defendants were prejudiced by instructions incorporating the internal CTA rules and by their use in closing argument.

Evidence regarding the CTA postaccident investigation, including the fact that Williams was charged with various violations of internal safety rules and retrained, constituted postaccident remedial measures improperly admitted as evidence of negligence. The corresponding jury instructions based on those internal rule violations improperly allowed the jury to consider evidence of postaccident remedial measures, including the fact that the CTA after investigation found that Williams violated internal safety rules, charged him with those violations, and retrained him. It was unfair to admit such evidence, and unfair to instruct the jury regarding the CTA's legal liability based on self-imposed internal guidelines aspiring to safety beyond that required by Illinois law. The creation of self-imposed rules or internal guidelines does not usually impose a legal duty, and violation of the rules or

guidelines does not ordinarily constitute evidence of negligence. *Morton v. City of Chicago*, 286 Ill. App. 3d 444, 454 (1997).

For the reasons previously discussed, the evidence of the post-accident remedial measures, together with incorporation of the CTA's internal rules into the jury instructions, deprived defendants of a fair trial. Accordingly, we reverse and remand for a new trial.

## CONTRIBUTORY NEGLIGENCE

■ We next address plaintiffs' contention that they should have been granted judgment notwithstanding the verdict (judgment *n.o.v.*) because no evidence established that Bulger was contributorily negligent. Judgment *n.o.v.* may be entered where " 'all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand.' " *Maple v. Gustafson*, 151 Ill. 2d 445, 453 (1992), quoting *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967). In ruling on a motion for judgment *n.o.v.*, the trial court may not weigh the evidence or concern itself with witnesses' credibility; rather, it may only consider the evidence in the light most favorable to the party resisting the motion. *Maple*, 151 Ill. 2d at 453. The trial court may not grant judgment *n.o.v.* where there is any evidence demonstrating a substantial factual dispute or where the assessment of credibility of the witnesses or the determination regarding conflicting evidence is decisive to the outcome. *Maple*, 151 Ill. 2d at 454. A trial court's decision regarding whether to grant judgment *n.o.v.* is reviewed *de novo*. *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 132 (1999).

■ At trial, Bulger testified that he stood on the corner, waited for a car to turn through the intersection, and then started walking across the street. However, Ken Kotz, who was an eyewitness to the accident, did not recall seeing Bulger look in the direction of the bus or stop at the corner before entering the intersection. Additionally, Williams testified that he waited for the intersection and crosswalks to clear before executing his turn. He also told a police officer that Bulger "all of a sudden appeared in front of the bus." Taken together, the testimony of these witnesses presented the jury with a substantial factual dispute relevant to the issue of Bulger's contributory negligence, *i.e.*, whether Bulger stopped at the corner or simply entered the intersection without looking. The jury's determinations regarding credibility and the resolution of the conflicting evidence were decisive to the outcome of the issue of contributory negligence. In this circumstance, judgment *n.o.v.* is inappropriate. See *Maple*, 151 Ill. 2d at 454.

After considering the record in the light most favorable to defendants, we cannot say that all of the evidence, when viewed in its aspect most favorable to the defendants, so overwhelmingly favors plaintiffs that no contrary verdict based on the evidence could ever stand. Accordingly, we conclude that judgment *n.o.v.* was properly denied in this case.

## DAMAGES

■ As previously noted, plaintiffs seek a new trial on both liability and damages, while defendants seek a new trial on liability only. Supreme Court Rule 366(a)(5) grants reviewing courts the power to order partial new trials. 155 Ill. 2d R. 366(a)(5). However, a reviewing court should limit the issues to be addressed on retrial "only where it is plain that any error that has crept into one element of the verdict did not affect the determination of any other issue." *Phillips v. Gannotti*, 327 Ill. App. 3d 512, 521 (2002). A limited retrial is appropriate only if the questions of liability and damages are so separate and distinct that such a retrial would not be unfair. *Glassman v. St. Joseph Hospital*, 259 Ill. App. 3d 730, 769 (1994).

■ In the instant case, the acts for which defendants and Bulger are alleged to be liable are crucial to determining the extent of their liability. As previously noted, the jury found Bulger 50% contributorily negligent and reduced the damages accordingly. When the issues of liability and damages are inextricably intertwined a new trial should be granted on both liability and damages, if a new trial is ordered. See *Glassman*, 259 Ill. App. 3d at 769. We have previously noted the prejudicial effect on defendants caused by the improperly admitted evidence of postaccident remedial measures, together with the improper use of the CTA's internal rules in the jury instructions. We find the issues of liability and damages are inextricably intertwined. Accordingly, we reverse and remand for a new trial on the issues of liability and damages.

■ Although we have determined a new trial should be granted on the issues of liability and damages, we briefly address plaintiffs' allegations that improper commentary and inquiry were made by defense counsel. Plaintiffs assert that defense counsel's implications that plaintiffs' counsel had a relationship with the treating doctor were improperly inflammatory. Defense counsel's comment that Dr. Smith "calls them the way he's paid to see them" was inappropriate. On retrial defense counsel should refrain from inappropriate implications or comments.

Plaintiffs further assert that defendants improperly inquired into prior repetitive trauma as the cause of Bulger's symptoms. Based on

the evidence, we find defense counsel properly cross-examined plaintiffs' experts regarding various factors taken into account as the basis for their opinions. The experienced trial judge correctly resolved the motion *in limine* regarding this issue. Both Dr. Senno and Dr. Smith noted that Bulger complained of shoulder pain that developed during activity. Cross-examination by defense counsel was properly based on the evidence.

## CONCLUSION

The trial court abused its discretion in admitting evidence that Williams was charged with violating CTA rules and sent to retraining, as the charging and retraining were postaccident remedial measures taken by the CTA. The internal CTA rules at issue in this case lack the force of law and should not have been incorporated into IPI Civil (2000) No. 60.01-based instructions. Such instructions improperly interjected postaccident remedial measures into consideration by the jury. The trial court abused its discretion in giving those instructions, as they were based on postaccident remedial measures charging Williams with internal rule violations. Admitting the improper evidence and giving the jury the IPI Civil (2000) No. 60.01 instructions that incorporated the internal CTA rules unfairly prejudiced defendants.

We stress that we are not limiting the admission of evidence relevant to the operator's driving at the time of the accident. There is a difference between factual "time of the accident" evidence and evidence of postaccident remedial measures. Our holding regarding the inadmissibility of postaccident remedial measures is limited to results of CTA internal investigations, including "charging" operators with driving violations and requiring retraining, as occurred in the instant case. CTA personnel can testify about the facts of an accident without addressing the CTA's internal disciplinary response. Factual evidence about an accident obtained as a result of investigating the accident can properly be admitted as evidence providing it constitutes "time of the accident" evidence, not postaccident remedial measures. The exceptions to the postaccident remedial measures exclusionary rule do not apply based on the record in the instant case. Those exceptions and their application are fully discussed, as previously noted, by the Illinois Supreme Court in *Herzog*, 167 Ill. 2d at 300-03.

For the reasons previously discussed, we reverse the judgment of the circuit court and remand the case for a new trial on liability and damages.

Reversed and remanded.

TULLY and GALLAGHER, JJ., concur.