# Illinois Official Reports

## Appellate Court

---

### *Davis v. City of Chicago*, 2014 IL App (1st) 122427

---

| | |
|---|---|
| Appellate Court Caption | JOHNETTA DAVIS, as Special Administrator of the Estate of Darryl Hamilton, Deceased, Plaintiff-Appellee, v. THE CITY OF CHICAGO, a Municipal Corporation, and DAVID GARZA, Defendants-Appellants. |
| District & No. | First District, Third Division<br>Docket No. 1-12-2427 |
| Filed<br>Rehearing denied | March 12, 2014<br>April 29, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In a wrongful death and survival action arising from an incident in which plaintiff's son was fatally shot by defendant police officer while being pursued on foot by the officer, the trial court's grant of a new trial to plaintiff based solely on remarks made by defense counsel in opening statements regarding a pending weapons charge against the deceased was reversed, since that evidence had been ruled admissible at the time the statements were made, the statements were made in good faith, there was no indication plaintiff was prejudiced by the statements, and any objection by plaintiff was waived when she opposed the grant of a new trial on that basis; therefore, the order granting a new trial was reversed and vacated and the verdict for defendants was directed to stand. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-L-7680; the Hon. Edward Washington II, Judge, presiding. |
| Judgment | Reversed. |

Counsel on
Appeal

Stephen R. Patton, Corporation Counsel, of Chicago (Benna Ruth Solomon, Myriam Zreczny Kasper, and Kerrie Maloney Laytin, Assistant Corporation Counsel, of counsel), for appellants.

Cochran, Cherry, Givens, Smith & Montgomery, L.L.C., of Chicago (James D. Montgomery, Melvin L. Brooks, and John K. Kennedy, of counsel), for appellee.

Panel

JUSTICE PUCINSKI delivered the judgment of the court, with opinion.
Presiding Justice Hyman and Justice Mason concurred in the judgment and opinion.

## OPINION

¶ 1   This case is before us on interlocutory appeal after the trial court granted plaintiff's motion for a new trial following a jury's verdict in favor of the defense in her wrongful death suit for the death of her son caused by the defendant police officer. The defendant officer and City of Chicago's defense was that the officer acted in self-defense and reasonably believed the decedent pointed a gun at the officer. The trial court granted a new trial based solely on the defense's references to the decedent's pending gun charge at the time of the shooting in opening statements. Defendants argue that the trial court abused its discretion in granting a new trial on this ground because there was no substantial prejudice to plaintiff by the isolated references to the gun charge.

¶ 2   Plaintiff moved *in limine* before trial to bar defendants from introducing evidence that the decedent had a court date on a pending gun charge the day after the incident in this case. The court denied plaintiff's *in limine* pretrial motion and ruled that the defense would be allowed to admit evidence of the decedent's pending gun charge. The defendants thus made two references to the pending gun charge during the defense opening statement. Plaintiff objected but was overruled. After the plaintiff's case and after all but two remaining defense witnesses testified in the defense case, the court *sua sponte* changed its *in limine* ruling, finding that the gun charge could not be used to prove motive, and barred admission of the pending gun charge into evidence. Defendants moved for a mistrial based on prejudice to their case but plaintiff opposed a grant of a mistrial, specifically stating that plaintiff believed the remarks in opening statement would not influence the jury. At that time, the trial was near conclusion when the court denied the defense's motion for a mistrial. The trial continued with the last two defense witnesses. No evidence was admitted regarding the pending gun charge and no further reference was made to it. The trial concluded two days later with a verdict for the defense.

After the verdict plaintiff moved for a new trial, arguing for the first time that the defense opening statement remarks were prejudicial. The court granted a new trial solely on this basis.

¶ 3    We hold that the plaintiff waived any objection to remarks made by the defense in opening statements concerning the decedent's pending gun charge and, in fact, later opposed the grant of a mistrial based on the same issue. In reviewing for any plain error, we hold that the trial court abused its discretion in granting a new trial where there was no error because at the time of the remarks the court had ruled the evidence admissible and there was no bad faith by the defense in making the remarks, and because there was no showing by plaintiff or any indication in the record of substantial prejudice to plaintiff as a result of those remarks.

¶ 4    Second, we address plaintiff's alternative argument that the grant of a new trial was appropriate due to alleged faulty jury instructions. We hold that the grant of a new trial cannot be supported on the alternate basis of allegedly faulty jury instructions because the court properly instructed the jury on the applicable law regarding willful and wanton conduct in the context of the Local Governmental and Governmental Employees Tort Immunity Act (745 ILCS 10/1-101 *et seq*. (West 2002)). We therefore reverse and vacate the order granting a new trial and remand with instructions that the circuit court enter judgment on the jury verdict.

¶ 5                                    BACKGROUND

¶ 6    Plaintiff's four-count complaint alleged wrongful death and survival claims against Officer Garza and the City of Chicago (the City) for the death of her son, Darryl Hamilton. Counts I and II alleged wrongful death and survival claims, respectively, against the City pursuant to *respondeat superior* based on Officer Garza's commission of a battery in intentionally shooting Hamilton. Counts III and IV alleged wrongful death and survival claims against Officer Garza for battery in intentionally shooting Hamilton.

¶ 7    Defendants asserted the affirmative defense for Officer Garza of immunity under section 2-202 of the Act, which provides that "[a] public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." 745 ILCS 10/2-202 (West 2002). The City asserted immunity under section 2-109 of the Act, which provides that "[a] local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable." 745 ILCS 10/2-109 (West 2002). At trial, the City and Officer Garza presented evidence that Officer Garza shot Hamilton in self-defense because he saw Hamilton point a gun at him.

¶ 8    Prior to this trial, plaintiff had voluntarily dismissed the action just before the first trial was scheduled to take place. Plaintiff then refiled and there were two trials prior to the trial at issue in this appeal. The first trial resulted in a mistrial during *voir dire*, and the second trial resulted in a hung jury, split 7 to 5.[1] In this trial, the court initially denied plaintiff's motion *in limine* to bar evidence that Hamilton had a pending gun charge against him, with a hearing in court set for the day after the shooting, and the jury heard a reference in opening statements regarding the pending gun charge. The court later *sua sponte* changed its ruling and barred evidence of

_____

[1]Although plaintiff claims on appeal that the split was seven in favor of plaintiff and five in favor of defendants, in support of this fact plaintiff cites to her own statement of facts in her reply brief supporting her posttrial motion below. We are unable to find any independent indication in the record that the split in this hung jury favored plaintiff.

the pending gun charge. No issue is raised in this appeal regarding the previous trials. The retrial began on October 6, 2011.

¶ 9                                                    Trial Testimony

¶ 10        The following facts are from the transcript of the trial testimony.

¶ 11        The evening of December 2, 2003, Darryl Hamilton was watching television with his grandmother, Bessie Hamilton. Bessie's house was on the east side of Dante Avenue in Chicago, directly across from the Enrico Fermi Elementary School. Plaintiff, Darryl's mother, lived a half-block away from Bessie, on the other side of the school. Darryl would spend time at both homes. Sometime around 9:20 p.m., Darryl left Bessie's house.

¶ 12        At approximately 9:30 p.m., Officer Garza and his partner, Officer John Moss, were patrolling in a marked police squad car in the area around 70th Street and Dorchester Avenue in Chicago, the intersection where the school is located. Officer Garza testified that this area was known for gang shootings, narcotic sales, burglaries and other crimes, and the officers had received orders to pay attention to it.

¶ 13        Officer Garza first observed Hamilton as the officers were driving southbound on Dorchester, across from the school, near the intersection of 70th and Dorchester. Officer Garza testified that Hamilton's behavior seemed suspicious because it was late at night, the school was closed, no one else was around, and Hamilton was standing in front of the school, looking up and down the street. When Hamilton saw the squad car, he immediately turned and started walking quickly toward the school grounds. The officers followed Hamilton in their squad car into the school parking lot and pulled up alongside him near the southeast corner of the school. Hamilton's hands were not visible. Instead, they were in his waistband area "bunched up." Hamilton took a step or two toward the squad car, then immediately turned and started running away.

¶ 14        Officer Garza exited the squad car and pursued Hamilton on foot. He lost sight of Hamilton when Hamilton rounded the southeast corner of the school, heading southwest. When Officer Garza rounded the corner, he saw Hamilton squatting to pick up a gun off the pavement. Hamilton looked up at Officer Garza and pointed the gun at him. Officer Garza reversed and tried to take cover behind the corner of the school building. Officer Garza did not have his gun out at that time. The south side of the school was well lit with artificial lighting.

¶ 15        Hamilton took off running again westbound along the south wall of the school. Hamilton then rounded the southwest corner of the school and ran north. Officer Garza again lost sight of Hamilton. Officer Garza continued to run west, unholstered his gun, and followed Hamilton around the corner. Officer Garza was yelling, "Stop, police, drop the gun."

¶ 16        When Officer Garza regained sight of Hamilton after rounding the southwest corner of the school, he saw Hamilton running north on the west side of the school. The lighting on the west side of the school was not as good as it was on the south side of the school, but it was sufficient for Officer Garza to see. Officer Garza was holding his gun in a "low ready position," approximately 8 to 10 inches below his eyes. He looked for and focused on the gun in Hamilton's hand. As Hamilton ran, Hamilton glanced back, swung his arm holding the gun out, and extended the gun back, pointing toward the corner where Officer Garza was. Officer Garza testified that he feared imminent death or great bodily harm and thought Hamilton was

- 4 -

going to kill him. Officer Garza fired four rapid shots at Hamilton. One shot struck Hamilton on his right upper arm and another struck him in the back of his head.

¶ 17 After firing the shots, Officer Garza saw Hamilton lying facedown on the ground. Officer Garza testified that he remembered feeling his mind go black and feeling like he was going to be sick. He was "pretty shaken up" and did not have a good sense of how much time elapsed. Officer Garza approached Hamilton with his gun drawn because he knew that Hamilton was armed. Officer Garza could not see either the gun or Hamilton's right hand. Hamilton was not moving. Officer Garza handcuffed Hamilton by standing over him and pulling Hamilton's hands behind his back to minimize the chance Hamilton could use the gun. He could not see the gun as he handcuffed Hamilton. Officer Garza did not know at that point that he had shot Hamilton in the head. Once Hamilton was handcuffed, Officer Garza took him by his right shoulder and rolled him toward his left to check if he was still alive. At that point, Officer Garza saw the gun lying under Hamilton's waist area. Hamilton died on the scene.

¶ 18 Plaintiff called Marlow Collins, who testified that on December 2, 2003, he lived in the building on the southwest corner of 70th and Dorchester, across from the school, with his then-girlfriend, Carmelita Dowdell. In the late evening hours, he and Dowdell were returning home from grocery shopping, walking along the west side of Dorchester, across from the school. After they reached a set of railroad tracks heading north, Collins observed Hamilton crossing Dorchester from the west side of the street to the east side, heading toward the west side of the school. He then saw a patrol car turning into the school parking lot. The car followed Hamilton as he was walking toward the south side of the school, and Hamilton began running toward the east side of the school. Collins lost sight of Hamilton after Hamilton rounded the southeast corner. He saw the squad car follow Hamilton around the corner.

¶ 19 Hamilton then came running back westward, and Collins observed him fumbling with the front of his jacket as he ran. According to Collins, as Hamilton reached a set of double doors on the south side of the school, he pulled out a gun and threw it up on the school roof. Collins did not see the gun come back down after Hamilton threw it up on the roof. Collins did not know for certain whether the gun actually went onto the roof. To his eyes, it appeared to land on the roof, but Collins conceded it could have hit something and fallen. Collins then saw that Hamilton ran at full speed around the southwest corner of the school with both arms pumping. He saw the officer stopped on the southwest corner of the school yelled, "Stop" or "Freeze," and then he shot Hamilton, and Hamilton fell.

¶ 20 According to Collins, Hamilton's back was turned toward Officer Garza when he was shot, and he did not see Hamilton in any other position. Collins admitted that his attention was focused on Officer Garza during the shooting, and he did not see Hamilton fall until the shooting stopped. Collins conceded that there were four shrubs between him and Hamilton when he witnessed the incident. After the incident, Collins told people on the scene that he believed that Hamilton had thrown a gun onto the roof. Responding officers searched the school roof and did not find any weapon.

¶ 21 Paramedic Steven Beauregard testified that, after arriving on the scene several minutes after the emergency call at 9:35 p.m., he found a gun when he rolled Hamilton's body over. The gun was positioned around Hamilton's waist area.

¶ 22 Plaintiff also called Dowdell, Collins' former girlfriend, who testified that she and Collins were returning from the grocery store heading toward the home where they resided together on the west side of Dorchester at 9:30 p.m. on December 2, 2003. She first saw Hamilton when

- 5 -

she was on the south side of the train tracks, as Hamilton crossed Dorchester from west to east toward the school. Hamilton headed east along a path on the south side of the school, and a squad car entered the school parking lot and traveled east along that same path. Hamilton rounded the southeast corner of the school, and the police car followed him. Dowdell then lost sight of Hamilton and the police car.

¶ 23    A few seconds later, Dowdell regained sight of Hamilton and saw him running back westward along the path and also saw the officer chasing Hamilton on foot. She observed that Hamilton almost fell when he reached an area on the south side of the school. She observed Hamilton reach down to the ground, but did not see Hamilton pick up anything from the ground and did not see anything in his hands.

¶ 24    Dowdell further testified that Hamilton rounded the southwest corner of the school and ran north. Hamilton's arms were in running position, and she did not observe his arms in any other position. When the officer who was following Hamilton reached the southwest corner of the school, he halted and yelled "Stop" and something else she could not discern. The officer then fired several rapid shots. Dowdell's testimony was somewhat contradictory. Dowdell testified that she did not see anything in Hamilton's hands while the officer was firing the shots; however, Dowdell was watching the officer at the time he was shooting. The shooting was loud and startling, which drew Dowdell's attention to the officer. As the officer was shooting, Dowdell was able to see the officer's hands extending outwards and pointing north and observed that one of the officer's hands was cupped under the other as he held his gun. She saw Hamilton fall face forward. On cross-examination, however, she testified that she was watching Hamilton the entire time while standing right next to Collins.

¶ 25    After the shooting, a lot of people from the neighborhood came outside, and other officers arrived on the scene immediately. Dowdell went inside her home briefly and, after coming back outside, she observed police officers on top of the roof of the school. She also observed two officers holding up a blue sheet near Hamilton's body, which obstructed her view of the body. Dowdell testified that she never saw Hamilton throw or attempt to throw a gun up on the roof, although she heard Collins tell others that Hamilton had thrown a gun on the roof.

¶ 26    Plaintiff also called Carol Coursey, whose testimony at trial was by videotaped evidence deposition. On December 2, 2003, at 9:30 p.m., Coursey was on the side of her house getting her work schedule from her parked car. Coursey's house was on Dorchester Street directly across from the school. Coursey saw Hamilton running fast from south to north. She did not see Hamilton extending his right arm backwards and could not see anything in his hands. Hamilton's hands were moving up and down in a running motion. Coursey remembers hearing three or four shots. Hamilton's hands went up and out, and he fell forward and hit the ground. She observed the police officer who fired the shots was standing on the south side of the school with his arms extended and both hands on his gun. Coursey testified that she closed her car door and ran into her house. Coursey put on her contact lenses and went back outside within two minutes. Once she went back outside she saw an officer on the school roof and heard him say something like, "I got something," or "he[re] something."

¶ 27    Coursey wears contact lenses but was not wearing her contact lenses at the time she observed the shooting. Coursey conceded that it was dark outside and she went inside for the purpose of putting in her contact lenses so that she could see better. Coursey admitted that she has problems seeing far without her contacts and has to squint to see things at a distance, but claimed that she was able that night to see without squinting from where she was standing. She

claimed remembering that Hamilton was wearing a black coat and black or dark blue pants, but admitted that during her discovery deposition she had testified that she did not remember what Hamilton was wearing.

¶ 28    Initially Coursey told the police that she had not seen anything. She testified that she did not tell the police that she had witnessed the shooting because she was scared. Coursey denied that she first heard the shots and then looked up. Coursey denied that she was not looking at Hamilton at the time he was shot. She admitted that she had previously testified under oath that she heard three or four gunshots and then looked up, at which point she saw Hamilton fall forward. Coursey had previously testified that she was looking through the front windshield of her car as she was reaching for her schedule when she saw Hamilton running. When she saw Hamilton running, she grabbed her work schedule sticking out from her open purse and "[w]hen he got shot, when he hit the ground, that's when I looked up."

¶ 29    Coursey denied closing her car door before she heard the shots, claiming she first heard the shots, but admitted that, at her deposition, she had testified to closing the door first and then hearing the shots. Coursey had also previously testified that when she saw Hamilton running, she was moving toward the front of her car and admitted that there were trees between where her car was parked and where Hamilton was running.

¶ 30    Shortly after the shooting, Bessie Hamilton heard that something had happened at the school and went outside. Bessie saw a young man's body lying on the ground. She knew it was Darryl because of the jacket he was wearing.

¶ 31    Nichelle Fraction, a City investigator assigned to investigate Hamilton's shooting, also testified. As part of that investigation, she took a statement from Coursey on December 3, 2003. Coursey told her that she had not seen the shooting but "[h]eard shots, looked out of [the] window, saw two police officers in uniform drag a body that was close to the school, north to south approximately 10 feet. Then more units arrived."

¶ 32    Dr. Shaku Teas, a forensic pathologist, testified as an expert for plaintiff. In her opinion, the bullet to Hamilton's arm entered in the back and exited through the front. According to Teas, this was consistent with someone being shot from behind who was running in a normal fashion with his arms moving. Plaintiff then rested.

¶ 33    Defendants called Lucien Haag, who testified that he was a forensic firearms investigator who had examined the shirt that Hamilton was wearing on the night of the incident. Based on his examination, he concluded that there were firearm residues on multiple areas of the lower part of Hamilton's shirt, which was consistent with Hamilton's carrying a firearm in his waistband during the incident. He also examined Hamilton's gun and concluded that scratches along the gun's right side were consistent with the gun falling on a hard surface and landing in the position in which it was recovered under Hamilton. On the opposite side of the gun's cylinder there were abrasions and impact damage consistent with the gun being thrown into the air and then falling down and hitting the pavement. Haag also testified that because the abrasions were on opposite sides of the cylinder it could be inferred that these impacts occurred close in time to each other, because with the passage of time and the firing of the gun, the cylinder would rotate.

¶ 34    Dr. William Lewinski, a behavioral scientist, testified as an expert for the defense. Lewinski opined that it takes a quarter of a second for someone to move an arm from in front of the body to back behind the body in a "strong arm back" position that would allow a shot to

pass through the front of the arm and exit through the back of the arm. It would take just under one-fifth of a second to return the arm from the strong arm back position to a square back running position. A transitional position, in which the arm was rotating from a strong arm back position to a square back running position, would allow a bullet to enter through the back of the arm and go through the front of the arm. From that position, it would take less than one-fifth of a second to complete the transition to the square back running position. Lewinski opined that a person could rotate his head and torso from looking behind to looking toward the front in under one-fifth of a second. That turn would be completed before someone could finish saying, "One." Lewinski testified it would have been possible for Hamilton, in between any of Officer Garza's four shots, to rotate his head and torso from backward to forward quickly enough to receive a shot to the back of his head.

¶ 35    Lewinsky reviewed the deposition testimony and opinion of Dr. Eupil Choi, deputy chief medical examiner and forensic pathologist who performed Hamilton's autopsy, and also plaintiff's expert, Teas. Choi had opined that the shot to Hamilton's arm was the reverse from Teas' opinion, and that the bullet went from the front to the back of his arm, not from the back to the front. Lewinsky opined that both Choi's and Teas' theories for the position of Hamilton's arm when he received the bullet wound were consistent with running away and pointing a gun back at Officer Garza. Both positions could be achieved while running at full speed. Lewinsky also opined that the location where the gun was found under Hamilton's torso close to his waistband was consistent with Hamilton using the strong arm and transitional positions, then getting shot and falling. Lewinsky testified that for Hamilton to have received a shot in the arm followed by a shot in the back of his head, his body must have rotated first toward Officer Garza, then away from him. This change in body position could have occurred very quickly, in half of a blink of an eye, or 14/100 to 18/100 of a second.

¶ 36    Lewinski testified that Officer Garza was not able to perceive the change in Hamilton's position during the time he was shooting, and that was true regarding whether Choi's opinion or Teas' opinion was correct concerning Hamilton's body position. Lewinski testified that "when [officers are] focused on aligning and controlling the recoil of their gun and getting it on target and their attentional processes are focused for a second and a half on trying to make that happen, their ability to detect, to note change on the part of the person they're shooting at and to stop shooting, even to see where their bullets strike, it's near impossible." In a situation involving a perceived threat, an officer is focused on shooting and making his weapon work effectively in order to survive the threat.

¶ 37    Dr. Choi, the deputy chief medical examiner and the forensic pathologist who performed Hamilton's autopsy, also testified. Choi concluded that the shot to Hamilton's head was the shot that killed him and that he died instantly. Choi also testified that there were abrasions on Hamilton's body that were consistent with Hamilton's falling forward after receiving the head wound, in particular an abrasion on the back of his right wrist consistent with landing on that hand. Choi disagreed with plaintiff's expert, however, and opined that the shot to Hamilton's arm was the reverse from Teas' opinion, and that the bullet went from the front to the back of his arm, not from the back to the front. Choi opined that the bullet that hit Hamilton's arm entered through the top of Hamilton's upper arm in front and exited through the back of his arm.

¶ 38    Ruling on Plaintiff's Motion *in Limine* to

### Bar Reference to Hamilton's Pending Gun Case

¶ 39 Before trial, plaintiff moved *in limine* to bar defendants from introducing evidence that Hamilton had a court date the day after the shooting on a pending gun charge. During the hearing on the motion *in limine*, defendants argued that they intended to read a certified court record showing that Hamilton had a pending hearing for the crime of unlawful possession of a firearm to support the defense theory of their case that Hamilton had motive to avoid being apprehended on the night of the shooting. The defense argued:

"We certainly are allowed to present evidence to explain why Darryl Hamilton did what he did. And *** having court the very next day on a gun charge is certainly motive for a young man to say, [']you know what, there's no way I'm going to be caught by the police. There's no way I'm doing that so I'm going to turn and point a gun at a police officer.['] Much more motive than someone who doesn't have court the next day.

So to *** bar us from presenting that evidence is essentially barring us from presenting our case. *** The probative value is clearly our entire case. That is the reason Darryl Hamilton did what he did."

¶ 40 The court indicated that it would allow the evidence but intended to give a limiting instruction so that the jury understood that it could consider the evidence only for Hamilton's motive. The court conferred with both plaintiff and defendants in crafting an appropriate limiting instruction for the evidence and assumed plaintiff's objection and allowed plaintiff an opportunity to state the objection. The following exchange occurred:

"THE COURT: For the record, the Court's concern, while over the plaintiff's objection, I'm sure, is that if this evidence is admitted under 404(b) that it doesn't have the same impact that a conviction and its prejudices prevent a limit in its admission from doing the same, so I've asked the City to provide a limiting instruction for me to review to see if there is a way that we can achieve that objective.

Have the plaintiffs [*sic*]–and of course you are not waiving any objection to this and I'm sure you feel this is totally improper and you are raising your objection to the admission of the evidence, but have you seen this instruction?

[PLAINTIFF'S COUNSEL]: We have.

THE COURT: All right. So let me look at it. Why don't you read that into the record.

[DEFENSE COUNSEL]: The instructions reads as follows: 'Defendants offer into evidence a certified record from the Circuit Court of Cook County which reflects that Darryl Hamilton had a court date of December 3, 2003 with a pending charge of unlawful possession of a firearm. You may consider this evidence for purposes of Darryl Hamilton's motive during his encounter with Officer Garza but you may not consider this evidence for any other purpose.'

THE COURT: Plaintiff, your objection?

[PLAINTIFF'S COUNSEL]: Of course, your Honor, we object to the limiting instruction. We object to the evidence going in for the reasons stated. And we also object to it on the grounds that it creates an unfair prejudice that far outweighs the relevancy of the evidence, if any, given the fact that 404(b) prohibits use of that kind of

motive evidence for purposes of proving acts and that's exactly the purpose for which they are seeking to use it."

¶ 41    The court ruled as follows:

"We have conflicting evidence here as to whether or not the decedent turned around with the gun or threw the gun on the roof. So the officer has to be able to talk about his versions of the facts and to show that that version of the facts may be more accurate, we can't look at the motive to act consistent with what the officer is saying on the part of the defendant.

So therefore I will allow the evidence to come in and only for the limited purpose, as the City suggested, of showing Darryl Hamilton's motive as it relates to the court appearance itself, not necessarily the–his guilty [*sic*] or innocence as it relates to the charges."

¶ 42    The court proposed a limiting instruction and allowed the parties to make amendments to the instruction. Plaintiff's counsel indicated he wanted to change the plural "charges" because there was only one gun charge pending. The court stated: "And you may. And for the record, you will do that without waiving your objection to the evidence coming in and the instruction itself, right? That is understood."

¶ 43    Immediately before the trial began, the court instructed the jury that "[w]hat is said in an opening statement is a summary of what the attorney believes the evidence will show. What is said in opening statements is not evidence in and of itself."

¶ 44    During the defense opening statement, defense counsel stated the following:

"Finally, as the evidence will show, Darryl Hamilton had a motive, indeed a very strong motive, to keep pointing his gun at Officer Garza that evening–"

¶ 45    Plaintiff then objected as follows: "Excuse me. For the record, we would like to make an objection as per our earlier argument." The court noted the objection and overruled it.

¶ 46    Defense counsel continued his opening statement as follows:

"Indeed, he had a very strong motive to keep point [*sic*] his gun at Officer Garza that evening and to try to get away from being arrested. Darryl Hamilton, you see, had a court date pending the very next morning for a previous illegal gun possession charge."

¶ 47    After Dr. Choi's testimony on September 19, 2011, but before the defense finished presenting their witnesses, including Officer Garza, a paramedic and another officer, the court *sua sponte* reconsidered its *in limine* ruling and barred defendants from introducing evidence of the pending gun charge and court date. The court stated it had "concerns" about the evidence "now that [the court] heard the evidence in the plaintiff's case and some of the defendants' case and see where this case is going." The court's view was that the evidence of the pending gun charge made plaintiff's theory of the case equally true, that plaintiff's decedent did not try to shoot the officer and instead wanted to flee and get rid of the gun. The court did not believe the evidence proved motive. The court stated to defense counsel:

"[Y]ou told me they were going to present this kid in a certain–this man in a certain way. They haven't. And as I've listened to the evidence and the way it comes out, no expert has said anything about how the victim holding the gun would react.

We've heard all of this stuff about how the policeman would react, what he focused on, and then we have Officer Garza. So they can cross-examine him. We don't have

- 10 -

Darryl Hamilton here. So to use some intrinsic [*sic*] evidence to show what was going on in his mind, it has to be something definitive because all sorts of things can go on in his mind. And him having a charge, a court date the next day doesn't show, in my mind, in and of itself that no one has said–other than you–that that makes him more likely to point a gun. We've had no behav–no criminal behavior list or whatever it is. It can show that he's less likely to have a gun.

And then because of the prejudice that's shown, we can't get rid of it with this instruction because now it's going to be he had a gun before, so then he's a bad guy."

¶ 48    Defense counsel clarified that he "did not preface his argument on this evidence coming in on anything in plaintiff's case." Defense counsel indicated that if the evidence were not allowed to come in, the defense would be severely prejudiced and would move for a mistrial.

¶ 49    The court continued the issue until after Officer Garza testified the following day, September 20, 2011. After Garza's testimony the parties presented their full arguments regarding the court's changed *in limine* ruling. At that time, the defense had only two witnesses left before they rested. The court ruled that it would not allow admission of the gun charge into evidence. The court felt that the evidence would create prejudice and that the jury would speculate that because Hamilton had a gun previously, he had a gun the day of the shooting. The court felt that there was "no way" that the defense could "lay the foundation for his state of mind and his motive" from the evidence, "because it doesn't do that."

¶ 50    The evidence was undisputed that a gun was found under Hamilton's body.

¶ 51    Defendants moved for a mistrial.

¶ 52                          Defendants' Motion for a Mistrial

¶ 53    Defense counsel argued that because the jury had already heard during opening statements that defendants intended to introduce evidence of the court date on the pending gun charge to prove Hamilton's motive, if the evidence was not admitted the "the jury will look at us as lying to them."

¶ 54    Plaintiff argued against the defense motion for a mistrial. Plaintiff's counsel stated that he "disagree[d] that the jury will think in terms of the City or the defense lying to them, first of all, because the court spells out very clearly opening statements are not evidence." Plaintiff's counsel further argued that "this incident occurred the very first day of trial *** near the tail end of [defendants'] opening statement," and plaintiff's counsel "[did]n't believe it would be something that the jury would hold on to." Plaintiff's counsel argued that the reference to Hamilton's gun charge "casts a very negative light on *** Hamilton" and hurt plaintiff's case but that plaintiff would "live with it," stating the following:

"So that doesn't hurt the City. It hurts us. I mean we're prepared to live with it. I mean it is what it is. But we also recognize that opening statements are not evidence, so ... ."

¶ 55    The court denied the motion for a mistrial, finding that it had already instructed the jury "that opening statements are not evidence" and "that they should wait until they've heard all of the evidence, the facts, and the law before making their decision." The court also noted that the evidence would not come up in closing arguments, which would be where evidence that the jury's "decision should be made on" is presented. The court further observed that it must rule on attorney's objections throughout the trial, and that the jury was well aware that sometimes it

must disregard an attorney's statements. The court concluded that the jury would not "look at [defense counsel] as liars."

¶ 56    Instead of granting a mistrial, the court proposed to modify the jury instruction on opening statements to address the effect of the court's reconsideration of its ruling on the motion *in limine*. In addition to the instruction that "an opening statement is what an attorney expected the evidence will before the trial begins," the court proposed adding, "during the trial the Court may admit, limit, or exclude evidence that an attorney expected to be presented when he or she initially gave the opening statement." Plaintiff did not have any objection to that instruction and did not propose any different instruction. The trial continued and evidenced concluded after the remaining two defense witnesses (paramedic Beauregard and Officer Moss) testified briefly, two days later. No evidence was offered at trial regarding the pending gun charge and no other reference to it was made during the trial or in closing arguments. At the end of the trial, plaintiff moved for a directed finding on the defendants' affirmative defense of immunity under the Act, which the court denied.

¶ 57    The court instructed the jury that "[a]n opening statement is what an attorney expected the evidence will be before the trial begins. However, during the trial the Court may admit, limit, or exclude evidence that an attorney expects to be presented when he or she initially gave the opening statement." The court also instructed the jury that "[i]f any statement or argument of an attorney is not supported by the law or the evidence, you should disregard that statement or argument." The court also gave a jury instruction on self-defense, and a modified civil pattern jury instruction defining "willful and wanton."

¶ 58    At defendants' request and over plaintiff's objection, the court also submitted two special interrogatories to the jury. The first special interrogatory read:

> "When Officer Garza shot Darryl Hamilton did Officer David Garza reasonably believe that Darryl Hamilton's actions placed him (Officer Garza) in imminent threat of death or serious bodily harm?"

¶ 59    The second interrogatory read: "Was Officer Garza's conduct in shooting Darryl Hamilton willful and wanton?"

¶ 60    On September 23, 2011, the jury returned a verdict for defendants. The jury answered "Yes" to the first special interrogatory and "No" to the second special interrogatory. The court entered an order on September 23, 2011, for judgment on the verdict in favor of defendants. The order indicated the jury was polled, and the jury's verdict was unanimous.

¶ 61                              Plaintiff's Motion for a New Trial

¶ 62    Plaintiff moved for a new trial, raising 10 issues: (1) the court's issues instruction was erroneous in that it characterized plaintiff's claim as one for negligence rather than for battery; (2) the court gave an erroneous definition instruction regarding willful and wanton conduct and should have used the unmodified Illinois pattern instruction on the issue; (3) the court gave erroneous jury instructions to the effect that it was plaintiff's burden to disprove the affirmative defense of self-defense, which improperly shifted the burden of proof; (4) the court erred in giving defendants' instruction on justifiable use of force in self-defense; (5) the court erred in submitting the two special interrogatories to the jury; (6) the court should have granted plaintiff's motion for a directed finding on defendants' immunity defense (745 ILCS 10/2-202 (West 2010)) because shooting four bullets at Hamilton showed an actual or deliberate

- 12 -

intention to show harm; (7) allowing the defendants' reference to the pending gun charge as "motive evidence" in opening statements was prejudicial error; (8) allowing Dr. Lewinski to testify as the defense expert was error because Lewinski lacked expert qualifications and his methodologies in reaching his opinions were unreliable; (9) the court erred in allowing evidence of Officer Garza's post-shooting feelings because it was prejudicial; and (10) the court erred in allowing evidence of Officer Garza's belief that the neighborhood of the shooting was a "high-crime area."

¶ 63     The court granted plaintiff's motion for a new trial solely on the basis of the reference in opening statements to Hamilton's pending gun charge and denied plaintiff's motion on all the other nine grounds she raised. Plaintiff argued that the court erred in not sustaining her objection to the defense's remark in opening statements concerning Hamilton's pending gun charge as the remark prejudiced her "because it informed the jury that [Hamilton] was a dangerous criminal, and a repeat offender." Plaintiff argued that the "jury likely used that character evidence [*sic*] to infer that Hamilton was more likely to have threatened the police officer's life."

¶ 64     During argument at the hearing on plaintiff's posttrial motion, plaintiff argued that "the prejudicial effect [of the reference to the pending gun charge in opening statements] was not softened by the fact that I indicated that we can live with it," but plaintiff "didn't want a curative instruction because it would further highlight something that harmed us." Plaintiff claimed that the statement "cast a great shadow on us throughout the case." The defense argued that plaintiff waived any error based on opening statements because plaintiff's counsel stated that he was "prepared to live with" the reference and later argued against a mistrial on the same issue.

¶ 65     On July 27, 2012, the court granted plaintiff's posttrial motion for a new trial based on the remarks in opening statements and entered an order vacating the jury's verdict and granting the plaintiff a new trial. The court found that plaintiff's statement that she was "prepared to live with" the defense's reference in opening statements did not waive any objection and motion for a new trial on this ground. In its written order granting plaintiff's motion for a new trial, the court found as follows:

> "For two and one-half weeks the lawyers tried this case with admirable skill and intense zeal. The jurors accepted the interruption in their daily lives and met their commitment of service with promptness, patience, and unwavering focus. The Court did not want to cause these efforts to go to waste and to deprive the jury of the privilege of rendering a just and fair verdict. The court sought to preserve those efforts for the possibility of either an acceptable verdict or settlement.
>
> * * *
>
> Plaintiff's counsel went on to say that, 'I mean we are prepared to live with it. I mean it is what it is.' [Citation.] This comment is interpreted by the Court as Counsel accepting the fact the Court decided not to grant a mistrial. The Court views this editorial as Counsel's somewhat frustrated acceptance of the Court's instruction and that the Court would continue to move forward with a limiting instruction.
>
> The Plaintiff preserved her objection to this evidence at trial in opening statement and during the discussion concerning the language in the limiting instruction. [Citation.] Later, the Court arrived at the same position that the Plaintiff held from the

inception of the case. The Plaintiff will not be punished for an accommodation given in response to the 'Morton's fork' presented by the Court."

¶ 66     This court granted defendants leave to take an interlocutory appeal from the grant of a new trial.

¶ 67                                                    ANALYSIS

¶ 68     We are asked to review two issues: (1) if the court's decision to grant a new trial based on the defense's references to Hamilton's pending gun charge in opening statements was proper; and (2) if the grant of a new trial on the basis of those remarks in opening statements is not affirmed, whether the grant of a new trial was appropriate on the alternate grounds of alleged faulty jury instructions.

¶ 69                                            Opening Statement

¶ 70     A trial court should not grant a motion for a new trial unless the jury's verdict is against the manifest weight of the evidence or the trial errors are serious and prejudicial. *Tierney v. Community Memorial General Hospital*, 268 Ill. App. 3d 1050, 1054 (1994). In reviewing a decision to grant a new trial, we must view the evidence in the light most favorable to the jury's verdict. *Tierney*, 268 Ill. App. 3d at 1054-55. As defendants concede, there is authority holding that the decision to grant a new trial should be accorded more deference than the decision to deny one (*Graham v. Northwestern Memorial Hospital*, 2012 IL App (1st) 102609, ¶ 39). But while we generally owe deference to the court's ruling, we will not show deference to the circuit court and should reverse the grant of a new trial where neither the court's order nor the record supports the ruling. See *Graham*, 2012 IL App (1st) 102609, ¶ 35.

¶ 71     In this case, in questioning if a new trial was warranted, no argument was made that the jury's verdict was against the manifest weight of the evidence, below or before us on appeal, and the trial court did not find that the verdict was against the manifest weight of the evidence. Rather, the court granted a new trial solely on the basis of the reference to Hamilton's pending gun charge by the defense in opening statements.

¶ 72     "Questions as to the prejudicial effect of remarks made during opening statement[s] and closing argument are within the discretion of the trial court, and determinations as to such questions will not be overturned absent a clear abuse of discretion." *Simmons v. Garces*, 198 Ill. 2d 541, 568 (2002) (citing *Rockwood v. Singh*, 258 Ill. App. 3d 555, 558 (1993), *Magna Trust Co. v. Illinois Central R.R. Co.*, 313 Ill. App. 3d 375, 395 (2000), and *Sawicki v. Kim*, 112 Ill. App. 3d 641, 645 (1983)). " ' "A court abuses its discretion only where its ruling is arbitrary, fanciful, or unreasonable, or where no reasonable person would adopt the court's view." ' " *Graham*, 2012 IL App (1st) 102609, ¶ 21 (quoting *Cardona v. Del Granado*, 377 Ill. App. 3d 379, 385 (2007), quoting *Evitts v. DaimlerChrysler Motors Corp.*, 359 Ill. App. 3d 504, 513 (2005)).

¶ 73     Defendants argue that the court abused its discretion in granting a new trial based solely on the references to Hamilton's pending gun charge in opening statements because plaintiff later waived this objection in arguing against a mistrial. Defendants also argue, if we do not find that plaintiff waived this objection, that the brief references to the gun charge in opening statements did not cause substantial prejudice to plaintiff because the evidence was admissible and because the references did not affect the verdict. In response, plaintiff argues she did not waive

- 14 -

her objection to the references in opening statements and that they did substantially prejudice her.

¶ 74    Defendants further argue the court abused its discretion in granting a new trial where it stated in its written order granting a new trial that it was holding out for an "acceptable" verdict or settlement, which indicates an impermissible motive for reversing the jury's verdict.

¶ 75    We first find that plaintiff did in fact waive any objection to the reference by the defense to Hamilton's pending gun charge in opening statements. Plaintiff attempts to bootstrap her objection to the evidence of the gun charge being admitted at trial to an all-encompassing objection that included the remarks made in opening statements, and the court accepted this argument in rejecting a finding of waiver in its order granting a new trial. But the record clearly negates this assertion. The record indicates that plaintiff preserved her objection only to the admission into evidence of the gun charge and the court's proposed limiting instruction, which the court reiterated on the record. She knowingly waived any objection to any prejudicial effect of the remarks made in opening statements as causing prejudice. In fact, plaintiff later argued against the defense motion for a mistrial on the basis of the very same remarks. Plaintiff's counsel argued that the remarks "occurred the very first day of trial *** near the tail end of [defendants'] opening statement," and plaintiff's counsel "[did]n't believe it would be something that the jury would hold on to." Plaintiff's counsel specifically acknowledged that the reference to Hamilton's gun charge "casts a very negative light on *** Hamilton" and hurt plaintiff's case but that plaintiff would "live with it." Plaintiff's counsel also stated that "we also recognize that opening statements are not evidence." Plaintiff's decision was not merely a procedural forfeiture; it was an intentional waiver, which is different. A forfeiture is a failure to make a timely assertion of a right and "is different from waiver." *Gallagher v. Lenart*, 226 Ill. 2d 208, 229 (2007). Waiver " 'consists of an intentional relinquishment of a known right.' " *Gallagher*, 226 Ill. 2d at 229 (quoting *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 326 (2004)).

¶ 76    Plaintiff's renewal of her objection at the time the remarks were made in opening statements was limited to the same grounds as previously stated, which was only an objection to the admission of the gun charge into evidence and an objection to the court's proposed limiting instruction. At no time did plaintiff ever indicate a change in her position to object to the remarks in opening statements as substantially prejudicial in and of themselves to warrant a new trial. Thus, plaintiff voluntarily waived any objection to the remarks made in opening statements.

¶ 77    The trial court found in its written order granting a new trial that plaintiff did not waive an objection to the prejudice of the defense remarks because by arguing against a mistrial and indicating that she would go forward with the trial to proceed to verdict plaintiff indicated "frustrated acceptance" of the court's ruling not requiring any further objection. This argument that a trial court's definitive ruling on a motion *in limine* renders any further objection unnecessary has previously been considered and rejected by this court. See *Guski v. Raja*, 409 Ill. App. 3d 686, 696 (2011) (rejecting the holding in *Spyrka v. County of Cook*, 366 Ill. App. 3d 156 (2006), that any ruling on the merits of the motion *in limine* where the full context of the evidentiary issue develops at trial is not interlocutory and no further objection is necessary to preserve the issue for review). This court made clear that in order to preserve objections related to evidence sought to be excluded *in limine* for appellate review, the party must make a contemporaneous objection. *Guski*, 409 Ill. App. 3d at 695. As we have noted, at the time the

court *sua sponte* changed its *in limine* ruling near the end of the defense case and the defense moved for a mistrial, plaintiff argued against a mistrial and new trial because she believed the jury would not "hold onto" the brief references in opening statements, establishing knowing waiver.

¶ 78     This court has acknowledged that we may review comments as plain error despite waiver where such comments were " 'so egregious that they deprived [a party] of a fair trial and substantially impaired the integrity of the judicial process itself.' " *Pleasance v. City of Chicago*, 396 Ill. App. 3d 821, 830 (2009) (quoting *Spyrka*, 366 Ill. App. 3d at 170). This case, however, does not rise to this level.

¶ 79     Defendants argue there was no error because the evidence concerning the gun charge was admissible under Illinois Rule of Evidence 404(b), which allows evidence of other crimes to prove, among other things, motive. See Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). Defendants' argument, however, is not on point because the issue raised is not the admissibility of the evidence but, rather, whether the remarks made concerning that evidence in opening statements were reversible error requiring a new trial.

¶ 80     Plaintiff argues that the remarks were so prejudicial that the grant of a new trial was necessary, but prejudice is only one factor; there are actually two requirements necessary for a grant of a new trial due to improper opening statements. The remarks must be both: (1) deliberate misconduct and not made in good faith; and (2) substantially prejudicial. See *Nassar v. County of Cook*, 333 Ill. App. 3d 289, 304 (2002) (remarks made by counsel in opening statements to the jury are improper if the statements are not made in good faith and are prejudicial). See also *Klingelhoets v. Charlton-Perrin*, 2013 IL App (1st) 112412, ¶ 29 ("Reversal based on improper comments during opening statement will occur only when the comments are made deliberately via misconduct and result in substantial prejudice to the opposing party such that the result of the trial would have been different had the comments not been made.").

¶ 81     Plaintiff has made no showing on the first requirement that the remarks were not made in good faith and as the result of misconduct on the part of defense counsel. The record indicates to the contrary. An attorney's remarks during opening statement are not improper if they are made in good faith and with reasonable grounds to believe that the evidence which is the subject of the comments is admissible, even if the evidence is subsequently excluded. *Hilgenberg v. Kazen*, 305 Ill. App. 3d 197, 210 (1999). Cases finding that the grant of a new trial was necessary due to improper remarks in opening statements have generally been in cases where the remarks were made concerning evidence not made in good faith, without presenting evidence to support the statement made, and those remarks were substantially prejudicial. See, *e.g.*, *Taake v. WHGK, Inc.*, 228 Ill. App. 3d 692 (1992) (holding new trial was necessary where counsel for the defendant company made reference in opening statements to an expert witness when the witness was undisclosed and then also did not call the expert as a witness at trial).

¶ 82     Here, at the time defense counsel made the remarks concerning the gun charge, the court had denied plaintiff's motion *in limine* and ruled that the evidence would be admissible. Defendants were fully prepared to present evidence of the gun charge. The court then later *sua sponte* reconsidered the issue and reversed its ruling to bar the evidence. Once the court made the ruling to exclude the evidence of the gun charge, the defense did not mention it ever again during the trial and no evidence of the gun charge was admitted during the trial. The remarks in

opening statements were made in good faith at the time and with reasonable grounds to believe the evidence was admissible and thus were not improper.

¶ 83    Plaintiff argues that "[w]here the case is a close one on the facts and the jury could have decided either way, any substantial error that might have tipped the scales in favor of the successful party calls for a new trial," quoting *Los Amigos Supermarket, Inc. v. Metropolitan Bank & Trust Co.*, 306 Ill. App. 3d 115, 129 (1999). Plaintiff ignores, however, that the remarks were not "error" at all. At the time they were made the court had ruled the evidence of the gun charge would be admissible, and the court granted a new trial not because the remarks were error but because it deemed the remarks prejudicial. Plaintiff also does not explain how the isolated references to the pending gun charge only in opening statements tipped the balance in this case, involving a unanimous defense verdict, when the evidence at trial focused solely on the facts of the occurrence itself on the night of the actual shooting and the evidence was undisputed that there was a gun recovered under Hamilton at the scene.

¶ 84    The second requirement for a new trial based on remarks in opening statements is not just prejudice but, rather, *substantial* prejudice. Even if it could be said that the comments constituted error, our supreme court has cautioned that "it is not always grounds for reversal when an opening statement refers to evidence which later turns out to be inadmissible." *People v. Kliner*, 185 Ill. 2d 81, 127 (1998). "Parties are entitled to a fair trial, not a perfect trial." *Calloway v. Bovis Lend Lease, Inc.*, 2013 IL App (1st) 112746, ¶ 102 (citing *Buczyna v. Cuomo & Son Cartage Co.*, 146 Ill. App. 3d 404, 420 (1986)). A new trial is not warranted based on an improper opening statement or closing argument unless, when the trial is viewed in its entirety, the argument resulted in substantial prejudice to the losing party or rose to the level of preventing a fair trial. *Diaz v. Legat Architects, Inc.*, 397 Ill. App. 3d 13, 42 (2009); *Nassar*, 333 Ill. App. 3d at 304; *Tierney*, 268 Ill. App. 3d at 1061. " '[E]rrors in opening statements or closing argument *must* result in *substantial* prejudice *such that the result would have been different absent the complained-of remark* before reversal is required.' " (Emphases added.) *People v. Williams*, 192 Ill. 2d 548, 573 (2000) (quoting *People v. Cloutier*, 156 Ill. 2d 483, 507 (1993)).

¶ 85    There is no showing in this case that the isolated references in the opening statement substantially prejudiced plaintiff such that the result of the trial would have been different without those remarks. Before the verdict, plaintiff's counsel conceded he did not believe the references in opening statements would be prejudicial such that it would affect the jury's verdict. There was no other evidence or reference to the gun charge during the testimony of the defense's last two witnesses or closing arguments. Plaintiff's counsel argued against defendants' motion for a mistrial, acknowledging that the comment did prejudice plaintiff's case but arguing that she would "live with it," and did not feel a mistrial was warranted, clearly indicating that plaintiff did not feel any prejudice was substantial.

¶ 86    If, as plaintiff now argues, the reference to Hamilton's pending gun charge in the City's opening statement was so prejudicial as to deny plaintiff a fair trial, plaintiff had every opportunity to obtain a mistrial, but she declined. The reference to the gun charge only became prejudice plaintiff could not "live with" after the jury rendered its verdict in favor of defendants. But the impact of the City's opening statement does not change depending on the outcome of the trial. A contrary ruling would allow parties to knowingly waive perceived errors in the hope of obtaining a favorable verdict and, when the gamble does not pay off,

reverse course to rely on those same errors as grounds for a new trial. The deference afforded a jury's verdict does not permit such inconsistent strategies.

¶ 87　　As defendants point out, the trial was near conclusion after Dr. Choi's testimony with only two defense witnesses left when the court *sua sponte* reconsidered its *in limine* ruling and barred defendants from introducing evidence of the pending gun charge. The defense moved for a mistrial. Plaintiff argued against it. The court denied the mistrial. Had the court felt that substantial prejudice had been caused by the reference to the gun charge in opening statements, it would have found grounds for a mistrial at that time. Only after the verdict was rendered by the jury in favor of the defense did the court find that the isolated reference to the pending gun charge two weeks prior in opening statements somehow substantially prejudiced plaintiff. Yet, the court did not make any determination that the verdict was against the manifest weight of the evidence.

¶ 88　　The trial court's order indicates that the grounds for the court's finding of prejudice was purely conjecture that the jury may have been impacted by the references:

"A juror's natural inclination would be to speculate as to the cause of Darryl Hamilton's alleged behavior. The limiting instruction implied only the possibility that the court could prohibit the introduction of evidence mentioned in opening statements, a juror could not be certain that the judge had proactively excluded Darryl Hamilton's gun charge as motive, because it was never specifically mentioned. Accordingly, a juror *could have* naturally supplemented the Defendants' theory of events by drawing on the Defendants' allusion to the gun charge and made either a prejudicial propensity inference or an arbitrary motive inference in favor of the Defendants.

The evidence of the gun charge mentioned in opening statement had a prejudicial effect against the Plaintiff that far outweighed its probative value." (Emphasis added.)

¶ 89　　Our review of the record does not indicate any prejudice to plaintiff by the isolated references in opening statements prior to a two-week trial where the evidence focused on other issues, including expert opinions. There is no indication anywhere in the record that the reference to the gun charge at the beginning of a two-week trial, with a multitude of evidence concerning the shooting, including expert opinions, impacted the jury's determination at all. Rather, our review of the record indicates that the issues came down to the credibility of Officer Garza's fear for his life and a determination of the credibility of the respective expert witnesses' testimony. The jury heard the undisputed evidence that a gun was found under Hamilton near his waist area, and that the forensic firearms investigator examined the shirt that Hamilton was wearing on the night of the incident and that there were firearm residues on multiple areas of the lower part of Hamilton's shirt, which was consistent with Hamilton's carrying a firearm in his waistband during the incident. The evidence also focused on whether Hamilton had that gun drawn and also whether Hamilton tried to dispose of the gun. Much of the evidence centered on the expert testimony of the trajectory of the bullets that struck and killed Hamilton and the biomechanics of whether Hamilton could have turned to face the officer and then turned forward quickly enough for the bullets to have struck him from behind. There was no mention of Hamilton's pending gun charge by the defense during the rest of the trial or during closing arguments. There was also no reference to the pending gun charge by any witness during the trial. The jury did not send out any questions while deliberating regarding the mention of the pending gun charge, and did not ask any questions about opening statements or missing evidence referenced in opening statements.

¶ 90    Further, the court gave an instruction that opening statements are not evidence, which is generally recognized as curing any improper comments made in opening statements. See *People v. Pasch*, 152 Ill. 2d 133, 185 (1992); *People v. Cunningham*, 177 Ill. App. 3d 544, 553 (1988). The jury is presumed to follow the instructions given by the circuit court. *McDonnell v. McPartlin*, 192 Ill. 2d 505, 535 (2000). The court gave this instruction twice, once at the beginning of trial and again at the close of the evidence along with the other jury instructions. Such instructions to the jury, particularly considering the limited nature of the alleged improper comments, preclude a finding of substantial prejudice. See *People v. Sutton*, 353 Ill. App. 3d 487, 505 (2004) (the curative instruction to the jury, together with the limited nature of the improper comments, precluded substantial prejudice). We find no factual basis for the court's finding of prejudice warranting a new trial in this case.

¶ 91    We find *Reidelberger v. Highland Body Shop, Inc*., 83 Ill. 2d 545 (1981), apposite to this case. In *Reidelberger*, the trial court granted a new trial based on the conduct of the defendant's counsel, which it felt violated an *in limine* order during opening statement. The *in limine* order barred reference to vehicle movement called "leapfrogging" on the highway beyond five miles from the accident scene. *Reidelberger*, 83 Ill. 2d at 550. The court had made other comments prior to opening statements, however, confusing the scope of the *in limine* order that it would allow each side to present its theory of the case and that the defense would be allowed to "make an opening statement the way he wants it." *Reidelberger*, 83 Ill. 2d at 551. The court then gave a further inconsistent ruling, stating during a conference after the "leapfrogging" statement that reference " 'to the actions of the car a mile or two down the road is not admissible.' " *Reidelberger*, 83 Ill. 2d at 551-52. The trial court granted a new trial because of the defense counsel's reference in his opening statement. The Illinois Supreme Court, however, held that granting a new trial on this ground was an abuse of discretion and affirmed the judgment of the appellate court reversing the trial court's order. The court held:

> "Granting a new trial because of conduct of counsel which did not violate the original *in limine* order and because of what the court in retrospect perceived to be violations of rulings made during the trial, which the record reveals were neither clear nor consistent, constitutes a clear abuse of discretion." *Reidelberger*, 83 Ill. 2d at 553.

¶ 92    The facts in *Reidelberger* are similar to what happened in this case, although here the facts are even stronger, because at the time defense counsel made the reference to the gun charge the court had specifically ruled that this evidence would be admissible. Similar to *Reidelberger*, though, the court in this case revisited its ruling several times and ultimately reversed its position and ruled that evidence of the pending gun charge and court date would be inadmissible. As in *Reidelberger*, at the time defense counsel made the reference, counsel was not violating any *in limine* order. Instead, the court's own change in ruling apparently led it first to believe that the comments made in opening did not warrant a mistrial and later to conclude that those same comments warranted a new trial. Similar to *Reidelberger*, the court's grant of a new trial based on its retrospective evaluation of comments made in opening statement as prejudicial due to its own change in ruling constitutes an abuse of discretion.

¶ 93    Our courts have long regarded an *in limine* order as a "potent weapon" because it enables a party, before trial, to limit or prohibit interrogation by the other party and restricts the nonmoving party's presentation of his or her case. *Crawford County State Bank v. Grady*, 161 Ill. App. 3d 332, 340 (1987); *Lundell v. Citrano*, 129 Ill. App. 3d 390, 395 (1984); *Reidelberger v. Highland Body Shop, Inc*., 83 Ill. 2d 545, 550 (1981). *In limine* orders are

interlocutory and, thus, remain subject to reconsideration throughout the trial. *Cunningham v. Millers General Insurance Co.*, 227 Ill. App. 3d 201, 205 (1992) (citing *Romanek-Golub & Co. v. Anvan Hotel Corp.*, 168 Ill. App. 3d 1031, 1040 (1988), and *Ely v. National Super Markets, Inc.*, 149 Ill. App. 3d 752, 760 (1986)). "[E]ven if the court concludes that the evidence is inadmissible, it has the discretion to deny the motion *in limine* before trial." *Compton v. Ubilluz*, 353 Ill. App. 3d 863, 871 (2004) (citing *Cunningham*, 227 Ill. App. 3d at 205). "A court should make whatever correction or interpretation of an *in limine* order is necessary during the trial." *Cunningham*, 227 Ill. App. 3d at 205 (citing *Crawford County State Bank*, 161 Ill. App. 3d at 341).

¶ 94    We thus recognize that rulings on motions *in limine* are sometimes changed during the course of a trial and that, in hindsight, comments are made in opening statements concerning evidence which is later ruled to be inadmissible and excluded by an order *in limine* and that parties may be prejudiced by these changes in rulings. We also recognize that "a court is disadvantaged in ruling on a motion *in limine* because it is considered in a vacuum, before the presentation of the full evidence at trial that may justify admission or require exclusion." *Compton*, 353 Ill. App. 3d at 871. Our courts have, however, provided guidance to our trial courts to avoid this problem. "Courts must be certain that the order be specific to preclude introduction of the inadmissible evidence while not restricting the opposing party's presentation of its case" and "[a]ny correction or interpretation of the order should be made by the trial court to accommodate these competing interests." *Beasley v. Huffman Manufacturing Co.*, 97 Ill. App. 3d 1, 5 (1981). "Trial judges should attempt to enter narrow *in limine* orders, anticipate proper evidence that might be excluded by the orders, and make the orders clear and precise so that all parties concerned have an accurate understanding of their limitations." *Compton*, 353 Ill. App. 3d at 871.

¶ 95    " 'Oral *in limine* motions and orders provide fertile ground for confusion and misunderstanding during the trial.' " *Crawford County State Bank*, 161 Ill. App. 3d at 341 (quoting *Lundell*, 129 Ill. App. 3d at 395, citing *Reidelberger*, 83 Ill. 2d 545). " 'For this reason, in addition to a written motion a written proposed order should be prepared by the moving party prior to the trial court's ruling on the motion. The proposed order must clearly and specifically outline the evidence to be excluded.' " *Crawford County State Bank*, 161 Ill. App. 3d at 341 (quoting *Lundell*, 129 Ill. App. 3d at 395). "An unclear order *in limine* is worse than no order at all ***." *Compton*, 353 Ill. App. 3d at 871 (citing *Cunningham*, 227 Ill. App. 3d at 205). "It is well settled that both the motion *in limine* and the resulting order should be in writing to prevent confusion and misunderstanding during trial." *Compton*, 353 Ill. App. 3d at 871 (citing *Stennis v. Rekkas*, 233 Ill. App. 3d 813, 825 (1992), and *Cunningham*, 227 Ill. App. 3d at 205).

¶ 96    The court in *Cunningham* provided guidance that is on point for this case:

    "Where the evidence could be prejudicial, an order granting a motion *in limine* may be safer than an order denying it; the evidence will then be kept out until it is clear it should be admitted. Sometimes it may be appropriate not to allow comment on questionable evidence during opening statements. Still, a court should carefully analyze a motion *in limine* when the motion is first presented. Changed rulings destroy the desired certainty and clarity of an *in limine* order. It is a mistake for a court to continually shift its ruling as different evidence is presented and never reach a firm decision. (*Reidelberger*, 83 Ill. 2d at 551-52 ***.) Once a motion *in limine* is granted,

- 20 -

the movant must be vigilant and object when evidence is presented which may violate the order. The purpose of an *in limine* order is to exclude inadmissible evidence, not to create a trap which results in a new trial if the court in retrospect determines the rule was violated. *Reidelberger*, 83 Ill. 2d at 553 \*\*\*." *Cunningham*, 227 Ill. App. 3d at 205-06.

¶ 97 In this case, there was no written order of the ruling *in limine*. The court at first orally denied and then orally granted plaintiff's motion *in limine*. Then the court found prejudice to plaintiff resulting in its grant of a new trial, thereby creating a "trap" for defendants, not because any *in limine* order was violated but because the court's own change in ruling apparently led it to believe the remarks were prejudicial.

¶ 98 We note defendants' argument regarding the trial court's statements in its written order granting a new trial that it did not grant the defense motion for a mistrial because it was sought to preserve the litigants' efforts at trial and was awaiting either a settlement or an "acceptable" verdict. Defendants argue that the court's statement indicates an abuse of discretion due to an improper motive because it "plainly means the court wanted the jury to find for [plaintiff] and granted a new trial because that did not happen." We need not reach this issue, and do not base our holding on these comments, as the record before us demonstrates an abuse of discretion without delving into any alleged improper motive of the trial court.

¶ 99 As we stated above, there is nothing in the record from which we can infer any prejudice to plaintiff, much less substantial prejudice requiring a new trial. We cannot discern a clear reason for the court's arbitrary change in ruling, just before the close of trial, that the remarks would not influence the jury and then, right after the verdict, finding that the remarks were somehow prejudicial to plaintiff. The court did not even find any actual prejudice in its order but, rather, speculated as to what the jury may have thought. The court did not find that the jury's verdict was against the manifest weight of the evidence.

¶ 100 The record here indicates a fair trial. Although the evidence was contradictory concerning the position of Hamilton's body immediately prior to the bullets hitting him, the defense expert testified that the bullets still could have struck Hamilton in the manner they did, even if plaintiff's expert was believed. There was sufficient evidence to support the jury's verdict. The trial court's order below and the plaintiff's argument on appeal do not point to anything in the trial record indicating that the jury gave the isolated reference *any* weight or that the reference influenced its verdict at all, much less the required substantial prejudice. We therefore conclude the court's order granting a new trial was not warranted.

¶ 101                                    Jury Instructions

¶ 102 Plaintiff argues in the alternative, that if the court abused its discretion in granting a new trial, a new trial is nevertheless warranted because of faulty jury instructions. Plaintiff argues the instruction on self-defense should not have been given, and the definition instruction of "willful and wanton" improperly shifted the burden of proof to plaintiff to disprove self-defense.

¶ 103                              *Self-Defense Instruction*

¶ 104 As to the self-defense instruction, plaintiff argues that although she brought her claim under the Illinois Wrongful Death Act (740 ILCS 180/1 *et seq.* (West 2002)), "the substantive

- 21 -

law of the tort of battery governs," and that defendants were required to specifically plead and prove self-defense in order to be entitled to a jury instruction on self-defense. Plaintiff argues the instruction on self-defense was improperly given where defendants did not specifically plead self-defense in their answer to plaintiff's second amended complaint.

¶ 105    Plaintiff's argument on this point is not well grounded. Officer Garza pled and asserted the affirmative defense of immunity under section 2-202 of the Local Governmental and Governmental Employees Tort Immunity Act (Act): "A public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." 745 ILCS 10/2-202 (West 2010). The Act provides that "[a]ny defense or immunity, common law or statutory, available to any private person shall likewise be available to local public entities and public employees." 745 ILCS 10/1-101.1(b) (West 2002). Defendants presented evidence that Officer Garza's intentional shooting of Hamilton was not "willful and wanton" because he acted in self-defense.

¶ 106    In Illinois, " '[a] litigant has the right to have the jury clearly and fairly instructed upon each theory which [is] supported by the evidence' " *LaFever v. Kemlite Co.*, 185 Ill. 2d 380, 406 (1998) (quoting *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 100 (1995)). " 'All that is required to justify the giving of an instruction is that there be some evidence in the record to justify the theory of the instruction.' [Citations.]" (Internal quotation marks omitted.) *Dixon v. Union Pacific R.R. Co.*, 383 Ill. App. 3d 453, 466 (2008) (quoting *LaFever*, 185 Ill. 2d at 406). The evidence required to justify giving an instruction may be insubstantial. *LaFever*, 185 Ill. 2d at 406. The question of whether the evidence at trial raised an issue, thus requiring a particular jury instruction, is within the sound discretion of the trial court. *Dixon*, 383 Ill. App. 3d at 466 (citing *LaFever*, 185 Ill. 2d at 406).

¶ 107    The trial court did not abuse its discretion in giving the self-defense instruction, as the evidence at trial squarely presented evidence regarding the theory of self-defense. Officer Garza testified to his belief that he reasonably feared for his life and acted in self-defense; therefore, an instruction on self-defense was appropriate and the trial court did not abuse its discretion in giving the instruction.

¶ 108                    *Willful and Wanton Definition Instruction*

¶ 109    Plaintiff also argues that the court erred in shifting the burden of proof to plaintiff by the inclusion of the phrase "without legal justification" in the jury instructions. Plaintiff argues that "the circuit court botched the burden of proof" and that, "[i]nstead of instructing the jury that it was defendant's burden to prove that Garza shot Hamilton in self-defense, the court saddled Davis with the burden of disproving that affirmative defense."

¶ 110    "Whether to give or deny a jury instruction is within the trial court's discretion." *Bulger v. Chicago Transit Authority*, 345 Ill. App. 3d 103, 121 (2003) (citing *Frank v. Edward Hines Lumber Co.*, 327 Ill. App. 3d 113, 119 (2001)). "A new trial should not be granted because of improper jury instructions unless a party's right to a fair trial has been seriously prejudiced." *Bulger*, 345 Ill. App. 3d at 121 (citing *Frank*, 327 Ill. App. 3d at 119). "The test for determining the propriety of instructions is whether, considering the instructions in their entirety, the jury was fairly, fully, and comprehensively informed as to the relevant principles."

*Bulger*, 345 Ill. App. 3d at 121-22 (citing *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 100 (1995)).

¶ 111    The court modified the Illinois pattern instruction on the definition of willful and wanton conduct to include the phrase "without legal justification." Plaintiff's proposed jury instruction defining "willful and wanton" read as follows:

"When I use the expression 'willful and wanton conduct,' I mean a course of action which shows actual or deliberate intention to harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others."

¶ 112    The Illinois pattern instruction defining "willful and wanton" provides as follows:

"14.01 Willful and Wanton Conduct–Definition

When I use the expression 'willful and wanton conduct' I mean a course of action which [shows actual or deliberate intention to harm] [or which, if not intentional,] [shows an utter indifference to or conscious disregard for (a person's own safety) (and) (the safety of others)]." Illinois Pattern Jury Instructions, Civil, No. 14.01 (1995) (hereinafter, IPI Civil (1995) No. 14.01).

¶ 113    The court gave the following instruction:

"When I use the expression 'willful and wanton conduct' I mean a course of action which shows an actual or deliberate intention to harm *without legal justification*, or which, if not intentional, shows an utter indifference to or conscious disregard for Darryl Hamilton's safety." (Emphasis added.)

¶ 114    The very next instruction given by the court was the justifiable use of force instruction, which stated:

"A police officer is justified in using force likely to cause death or great bodily harm only when he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself."

¶ 115    "It is within the trial court's discretion to determine which instructions to give the jury, and a reviewing court will not disturb such a determination absent a showing that the trial court abused its discretion." *Naleway v. Agnich*, 386 Ill. App. 3d 635, 640-41 (2008) (citing *Schultz v. Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 273 (2002)). Supreme Court Rule 239 provides that "[w]henever Illinois Pattern Jury Instructions (IPI), Civil, contains an instruction applicable in a civil case, giving due consideration to the facts and the prevailing law, and the court determines that the jury should be instructed on the subject, the IPI instruction shall be used, unless the court determines that it does not accurately state the law." Ill. S. Ct. R. 239(a) (eff. Jan. 1, 2011). We may find that a given jury instruction properly instructed the jury on the relevant law based on the underlying complaint as well as the evidence at trial. See *Bakes v. St. Alexius Medical Center*, 2011 IL App (1st) 101646, ¶ 27 (affirming the jury instruction given at trial as properly instructing the jury as to the plaintiff's proper burden of proof based on the underlying complaint and the evidence at trial). The standard for determining whether a court has abused its discretion is whether, as a whole, the jury instructions fairly, fully, and comprehensively apprised the jury of the relevant legal principles. *Schultz*, 201 Ill. 2d at 273-74. We may not reverse a jury verdict based on allegedly faulty jury instructions unless the instructions both: (1) did not accurately state the law and clearly misled the jury; and (2) resulted in prejudice to the party. See *Naleway*, 386 Ill. App. 3d

at 641; *Studt v. Sherman Health Systems*, 2011 IL 108182, ¶ 28; *Central Illinois Electrical Services, L.L.C. v. Slepian*, 358 Ill. App. 3d 545, 550 (2005).

¶ 116     The parties' arguments in their briefs do not provide any authority on point for this specific issue of modification of the Illinois pattern jury instruction on the definition of "willful and wanton" where immunity under the Act is asserted in a claim for wrongful death based on the common law intentional tort of battery. There appears to be no clear guidance in precedent, but analyzing the claim brought, the defenses raised, and the evidence at trial clarifies that the instruction given correctly stated the law and there was no error.

¶ 117     Plaintiff argues that the inclusion of the phrase "without legal justification" caused an impermissible shift in the burden of proof to plaintiff, when it was defendants' burden to prove self-defense. Plaintiff argues that her only burden was proving that Officer Garza's conduct was willful and wanton. This is not the case. Plaintiff based her second amended complaint on wrongful death based entirely on Officer Garza's commission of the civil tort of battery. Under Illinois's Wrongful Death Act, plaintiff was required to prove that Hamilton's death was "caused by wrongful act, neglect or default." 740 ILCS 180/1 (West 2002). The wrongful act alleged by plaintiff was the civil common-law tort of battery based on the shooting of Hamilton. Thus, plaintiff first had the burden of proving the elements of the civil tort of battery. In defense, defendants asserted immunity under the Act. The Act provides immunity to local government employees from liability for acts committed in the execution or enforcement of any law unless that act was willful or wanton. Section 2-202 provides that "[a] public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." 745 ILCS 10/2-202 (West 2010). After the affirmative defense of tort immunity was raised, the burden shifted to plaintiff to not only prove that Officer Garza committed a battery, but also that the battery was willful and wanton. Thus, plaintiff had the burden of proving both the elements of battery and willful and wanton conduct.

¶ 118     There is no Illinois Pattern Jury Instruction on the civil tort of battery, which contributes to some confusion in fashioning an appropriate jury instruction defining willful and wanton conduct in the context of a battery claim. Defendants rely on *Bakes*, where this court recognized the "somewhat arcane tort" of battery has been defined in multiple ways depending on the nature of the action including, in the context of a shooting, contact by a defendant that is "unauthorized," as well as statements that battery "requires more than an intent to contact, in that a defendant must intend to cause a harmful or offensive contact." *Bakes*, 2011 IL App (1st) 101646, ¶ 22. Similar to this case, in *Bakes* the plaintiff's proposed instruction on the burden of proof for battery was merely that the defendant "intended to touch" plaintiff, "actually touched" plaintiff, the touching "was harmful or offensive," and the contact caused injury to plaintiff. *Bakes*, 2011 IL App (1st) 101646, ¶ 20. The defendant's jury instruction, which the court gave, provided that plaintiff had the burden of proving that defendant " 'had the intent to cause a harmful or offensive contact' " with the plaintiff, that defendant " 'made *unauthorized* physical contact' " with the plaintiff, and that the plaintiff was injured and the defendant's action caused the injury. (Emphasis added.) *Id*. We held that the battery instruction given was a correct statement of the law based on the complaint and the evidence in that case. We recognized in *Bakes* "the lamentable fact that there is no Illinois Pattern Jury Instruction on the tort of battery." *Bakes*, 2011 IL App (1st) 101646, ¶ 20. We also recognized, however, that "coming to a one-size-fits-all definition of civil battery is not only difficult, it may well be a

fool's errand, as it may suffice in some cases, yet be misleading and inappropriate in others." *Bakes*, 2011 IL App (1st) 101646, ¶ 26.

¶ 119    There is, however, a criminal pattern jury instruction on the criminal offense of battery which uses the phrase included in the instruction in this case, "without legal justification," that provides guidance. Criminal cases and statutes pertaining to self-defense are persuasive authority in civil cases in which self-defense is implicated. *Denson*, 205 Ill. App. 3d at 130. The pattern instruction for the criminal offense of battery provides as follows:

> "A person commits the offense of battery when he [ (intentionally) (knowingly) ] [*without legal justification*] and by any means [ (causes bodily harm to) (makes physical contact of an insulting or provoking nature with) ] another person." (Emphasis added.) Illinois Pattern Jury Instructions, Criminal, No. 11.05 (4th ed. 2000) (hereinafter, IPI Criminal 4th No. 11.05).

¶ 120    The Committee Note provides that the phrase "without legal justification" should be used "whenever an instruction is to be given on an affirmative defense contained in Article 7 of Chapter 38." IPI Criminal 4th No. 11.05, Committee Note. "Article 7, Chapter 38" of our statutes concerned justifiable use of force and has been renumbered as chapter 720, Act 5, article 7. See 720 ILCS 5/7-1 (West 2002).[2] Given that the instruction in criminal cases is to use the phrase "without legal justification" where self-defense is raised as an affirmative defense, the parallel use of the phrase "without legal justification" in the context of a civil action for the tort of battery makes sense where justifiable use of force or self-defense is raised.

¶ 121    The court excluded "without legal justification" from both the burden instruction and the issues instruction, stating that the issues instruction also implicates the burden of proof, and included it only in the definition instruction of "willful and wanton" based on IPI Civil (1995) No. 14.01. The court specifically found and stated to plaintiff's counsel as follows:

> "THE COURT: But you're without justification is [*sic*] if the young man had no gun and he had his back to him. Not that just he shot him, the circumstances under which he shot him. So that's the 'without justification.' The deliberate shooting of someone who is running away from you without a gun simply makes that very simple for the jury. That's what you are arguing. I don't know how that is an additional burden. And that's the point of the case: Whether he's facing him with a gun or not.
>
> [PLAINTIFF'S COUNSEL]: No, I understand that, Judge. But in terms of establishing battery–
>
> THE COURT: But you're saying that he deliberately shot him. It's not just a battery. It's a battery with a willful and wanton component to it.
>
> [PLAINTIFF'S COUNSEL]: And the jury will get an instruction on willful and wanton. In the very inception of this instruction we say that the plaintiff claims that the defendant committed a battery against Darryl Hamilton Jr.

---

[2]Defendants argue that the definition of willful and wanton appropriately included "without legal authority" based on section 7-5 of the Illinois Criminal Code of 1961, which sets forth a police officer's justifiable use of force while making an arrest (720 ILCS 5/7-5 (West 2002)), but there was no evidence that Officer Garza was attempting to arrest Hamilton at the time of the shooting. Section 7-1, applicable to any self-defense, applies to the evidence instead.

Plaintiff further claims that defendant Garza was willful and wanton in the following respects. And then we include the allegation, which is 'deliberately shooting Darryl Hamilton.'

THE COURT: But just in shooting him doesn't make him willful and wanton. Over your objection, required 'without justification.' "

¶ 122     There was no error in the modification of the willful and wanton definition instruction. The court's modification of IPI Civil (1995) No. 14.01 incorporating the phrase "without legal justification" harmonized plaintiff's burden of proof on her battery claim to prove the contact was unauthorized, the affirmative defense of immunity under the Act, and plaintiff's burden to prove willful and wanton conduct, while accounting for self-defense or legal justification as a legally authorized contact. The form of the instruction correctly stated the law applicable to this case. Plaintiff's proposed instruction would have incorrectly made defendants automatically liable for the intentional shooting without accounting for the affirmative defense of tort immunity. Plaintiff fails to satisfy the first required prong for reversal based on faulty jury instructions because the instructions given accurately stated the law. We therefore conclude there is no basis for the grant of a new trial on the alternate ground of faulty jury instructions.

¶ 123                                    CONCLUSION

¶ 124     The plaintiff waived any objection based on prejudice to remarks made by the defense in opening statements concerning the decedent's pending gun charge when she, in fact, opposed the grant of a mistrial. Even in reviewing the issue to determine whether there was any plain error, we hold that the trial court abused its discretion in granting a new trial because there was no error where at the time of the remarks the evidence was ruled admissible and the defense made them in good faith, and there was no showing by plaintiff or any indication in the record of substantial prejudice to plaintiff as a result of those remarks. The grant of a new trial also cannot be supported on the basis of allegedly faulty jury instructions, as the court properly instructed the jury on the applicable law. We therefore reverse and vacate the order granting a new trial and hold that judgment on the jury's verdict must stand.

¶ 125     Reversed.